[Crim. No. 2372. Second Appellate District, Division One.—September 14, 1933.]

THE PEOPLE, Respondent, v. ARTHUR GILYARD, Appellant.

M. H. Broyles and Gladys Towles Root for Appellant.

U. S. Webb, Attorney-General, and Frank Richards, Deputy Attorney-General, for Respondent.

WORKS, P. J.—Defendants were convicted under an information in two counts, one charging arson and the other charging the burning of insured property. Gilyard appeals from the judgment and from an order of the trial court denying his motion for a new trial.

Appellant's first contention is that the evidence was insufficient to support the verdict of the jury. Gilyard owned a certain frame dwelling in Los Angeles which was occupied by a tenant, a woman with three minor children. Gilyard himself occupied a garage in the rear of the dwelling together, at least sometimes, with defendant Siplin, to whom we shall refer hereafter as Evelyn. The charges related to the dwelling and not to the garage. Evelyn, between whom and Gilyard existed an illicit relationship, was with her inamorato in the garage during the day preceding the night on which the fire occurred. At a time after 7:30 and before 9 o'clock in the evening, it was testified that the pair left the garage and went to the home of Evelyn's mother, where, according to some of the direct testimony, they slept together all night.

The fire department responded to a call at about 3:20 in the morning and found the dwelling aflame. The fire was extinguished after but a small part of the building had been consumed. The "arson squad" of the fire department arrived on the scene at about 6:30 the same morning and proceeded to an investigation into the causes of the fire. The officers broke into the garage, which was locked. There they found a five-gallon can about one-fourth filled with kerosene. They also saw in the garage two clothes-lines on which were hanging articles of men's and women's wearing apparel. In the part of the garage used for residential purposes they found furniture and a coal-oil stove, with a teakettle sitting on it in place. In this kettle was water which was lukewarm at the time, with no fire under it. While the arson squad was at the scene of the fire Evelyn appeared, alone. She and Gilyard had left her mother's house together, so it was said, some time earlier, in Gilyard's car, but he had dropped her a block distant from the scene of the fire. There was a spot or hole in the sole of one of Evelyn's shoes which gave out the odor of kerosene when she was talked to by the officers.

At about 9 o'clock in the morning Gilyard came to the place, accompanied in his car by one Ford. When questioned by the officers Gilyard said that he had been all night at the house of Ford, and the latter made a statement to the same effect. At the trial, however, Ford testified to the contrary. But to return to the scene of the fire. Not only did the officers question Gilyard on his arrival, but they examined his wearing apparel. Some fresh-looking spots on his shoes gave forth the odor of kerosene, and spots on one leg of his trousers emitted the same effluvium.

Meanwhile the officers had made a search under the partially burned house. There they found some rags and women's silk stockings, all of which gave forth the odor of kerosene. After completing their investigation at the scene of the fire the officers went to the home of Evelyn's mother, where also resided her sister. There they found many pairs of old silk stockings and a quantity of old clothes. There was evidence from which the jury could justly have inferred that one of the stockings found under the partially burned house was the mate to one found at Evelyn's home. We think, without the necessity for discussion, although we shall hereafter mention further evidence, that the verdict was amply supported. However, we shall later further refer to the count charging the burning of insured property.

■ It is contended that the trial court erred in receiving in evidence a certain card which was on a mail-box on the front porch of the partially burned dwelling. On this card the names of both Gilyard and Eyelyn were inscribed. The card thus gave notice to postmen that mail addressed to both parties was to be deposited in the box. The card therefore tended to prove that Evelyn regularly lived with Gilyard on the premises, being cumulative of other evidence to the same effect. During the day preceding the fire the two defendants were together in the garage throughout the period. Evelyn did a washing, and we have already recited that when the arson squad broke into the garage the next morning there was found in the structure a clothes-line on which was strung a woman's wearing apparel. From all this evidence, the card included, and other evidence to be mentioned later, the jury was justified in finding that Gilyard and Evelyn left their usual place of abode in the

evening and, ostensibly at least, if they did leave at all, went to the home of the woman's mother to spend the night together, with the purpose of establishing an alibi as a defense whereby to loose them under the charge of having committed crimes already planned by them in concert. The car, together with all the evidence referred to above, strongly tended to show circumstantially a conspiracy between the two to burn the house, the state thus being entitled to claim the statements or acts of either, after the formation of the conspiracy, as evidence against the other. The card was therefore properly received in evidence also on this ground.

■ A fire insurance policy on the dwelling, taken out by Gilyard, was admitted in evidence, and it is insisted that the admission was error. There is no merit in the point. Under a charge of burning insured property one of the necessary elements of proof to be produced by the prosecution is that the property was insured.

■ The trial court received in evidence a teakettle which was sworn to have been the container of the luke-warm water found on the stove in the garage by the arson squad some time after the arrival of its members on the scene at about 6:30 in the morning. The offer of the teakettle was, of course, useless. It might better have been offered in rebuttal if the defense had produced evidence tending to prove that Gilyard and Eyelyn kept no teakettle on their stove. Still, we cannot perceive that the offer of the kettle did harm to appellant. It was testified, without dispute, that a teakettle was on the stove when the officers broke into the garage, but the really material evidence was that the vessel then contained water, the temperature of which was shown to have been from 100 to 110 degrees Fahrenheit. The fire occurred on or about December 28th. There was testimony that the morning was "cold". Evidence was introduced to show that if the water in the kettle had stood at the boiling point when Gilyard and Evelyn left the garage on the evening preceding the fire, if they did, it must have stood lower than its temperature when the officers discovered it. ■ Indeed, we think we may take judicial notice of the fact that on a night in late December, even in Southern California, under the circumstances presented here, water at 212 degrees Fahrenheit at 9 o'clock

in the evening, or before, could not have been as warm as the officers found the water in the kettle after 6:30 the next morning, even if the garage was ventilated only by air coming through crevices around doors and windows. Counsel for appellant wonder what this evidence concerning the warm water tended to prove. There should be no doubt upon this point. It tended strongly to show that either Gilyard or Evelyn, or both, remained in the garage until shortly before the tenant of the dwelling gave the fire alarm, or that either or both, granting that both left the garage in the evening, returned to the place at a time not long before the alarm was given. This evidence alone, therefore, was in substantial conflict with the evidence offered in support of the defense of alibi. At any rate, whether the reception of the teakettle in evidence was proper under the law, or whether it was not, the admission of it stands in minimized insignificance when compared with the testimony concerning the receptacle and its contents. We have been at some pains in considering this question because some of the evidence referred to during the discussion adds materially to what we have said above as to the sufficiency of the evidence to support the verdict.

A jar of earth, taken by the police from beneath the partially burned house and giving forth the odor of kerosene, was admitted in evidence. There was no error here, as this real evidence tended to prove that the fire was of incendiary origin.

Appellant contends that the evidence shows that he had no motive in burning the house under the count charging a burning of insured property. The place was under mortgage for $1800, and the mortgagee, as is usual in such cases, had a first claim against the insurance for reimbursement in case the dwelling was burned. An expert witness testified that if the building had been burned completely the insurance company could have reproduced it at a cost of a little less than $1300. On this theory it is argued that Gilyard could not possibly have profited by the fire, and that therefore motive on his part to burn insured property was not shown by the prosecution. But we are not bound to assume, nor was the jury which tried the case, that Gilyard possessed the knowledge conveyed by the testimony of the expert witness, or that he even believed it when he heard it.

We must, however, find in the record some evidence upon which the jury could justly base an inference that Gilyard intended to defraud the insurer when he set fire to the house, and we think the evidence is there. When a man fires the property of another he is inspired to the act by a spirit of malicious mischief, by a desire for revenge, or perhaps because he is a victim of pyromania. When a man burns his own house, however, and the place is insured, there is in these very circumstances a temptation to others to perceive something in his act other than a mere desire to see flame and smoke rise into the air. This fire, too, might have entailed very serious consequences, and from that circumstance the jury might justly have inferred that some interested motive impelled Gilyard to incendiarism. A woman and her three minor children were domiciled in the dwelling, and Gilyard knew it. The fire was probably set not far from 2 o'clock in the morning, as the tenant testified that she was awakened by its crackling at about that hour and then sent in an alarm. It is quite likely that the blaze started long after 2, rather than before, as officers of the fire department testified that they arrived at the place at about 3 :20, and as the house was so located that a city fire station could not have been greatly distant from it. At any rate, the house was fired at a time when it could have been inferred that the inmates were sleeping soundly. A quadruple homicide might easily have been the result of Gilyard's act. Another circumstance: The house was producing a rental of $20 to Gilyard monthly, and the jury must have inferred some motive on his part in committing an act which would deprive him of the income. As the house was insured for $3,000, and as the amount of the mortgage against it was only $1800, Gilyard, perhaps not having the knowledge of the expert witness, might have believed that he could have profited out of the difference between the face of the mortgage and the face of the policy. Under all the circumstances we think this an inference which the jury could justly have drawn. As we have said above, the evidence was sufficient to support the charge of arson. This fact, taken together with what we have just said upon the question of intent, indicates clearly to our minds that the evidence amply supports the verdict on the other count.

Other points are made. Some are so plainly without merit as not to require discussion, while others are baldly stated without argument.

Judgment and order affirmed.

Stephens, J., and Craig, J., concurred.