[Crim. No. 3856. Second Dist., Div. Three. Feb. 8, 1945.]

THE PEOPLE, Respondent, v. GLENN E. WOMBLE, Appellant.

Seymour J. Chotiner and Leonard F. Herzog for Appellant.

Robert W. Kenny, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

SHINN, J.—Defendant appeals from a judgment following a verdict of guilt in a prosecution for assault with a deadly weapon, a .32 automatic pistol, upon the person of one Robert J. Breese. Upon his appeal he challenges the sufficiency of the evidence to establish guilt and complains of error in instructions that were given and in the refusal of an instruction. It is claimed by defendant that there was not sufficient evidence to prove that the gun was loaded at the time of the alleged assault or that it was used in the assault.

Defendant was the proprietor of a cafe located on the highway several miles out of Oxnard. Robert J. Breese, a seaman first-class, and Harold H. Brooks, a coxswain, who were stationed at Port Hueneme, being on liberty, entered the bar of defendant's cafe about 6 o'clock in the evening. Defendant's wife and two others were seated there, a bartender was behind the bar, and a waitress entered the room and served Breese and Brooks a drink of whiskey. Defendant

entered the bar shortly afterward and the evidence was that he was under the influence of liquor. Learning that it was Mrs. Womble's birthday, Breese and Brooks asked her if she wished a drink, which she, already having one, declined. The evidence of the prosecution disclosed that defendant objected to the presence of Brooks' car outside the cafe, saying that it added nothing to the looks of the place, which Brooks admitted. Defendant said that he didn't like sailors patronizing his place, that "They come in and spend a buck and a half and expect to have a good time," and Brooks said that he "was probably used to a lot more money" than defendant was and had "poured more money down rat holes than defendant had ever had." Defendant ordered Breese and Brooks out of the cafe and as they started to leave the place defendant said, "Don't rush off, I will take care of both of you boys," and started toward a room in the rear. As Breese left the place he was struck in the back with a padlock which had been thrown at him. He turned around when he was six or seven feet outside the building and defendant was then rushing toward him pulling a gun from his pocket. Breese grabbed defendant's right hand, in which the gun was held, shoved it down and called to Brooks to grab the gun; it was taken from defendant's hand by a Mr. Helms, a patron of the place. As to the manner in which the gun was handled by defendant, Breese testified that the gun was in defendant's right hand, "he was pulling it up this way (illustrating) and I jumped him and I pinned his hand down—he was bringing the gun up—when I first saw it the gun was coming up—it was not pointed directly at me but he was bringing it up about right in there (illustrating) when I first saw it. That is when I jumped him." There was testimony that Breese and Brooks were not under the influence of liquor, although Breese testified that he had taken one drink and Brooks that he had taken two before they came to defendant's cafe. When questioned by the officers shortly after the occurrence, defendant denied that he had had or used the gun in the affair but when Mr. Helms told of taking the gun from defendant he admitted having had it and stated it had fallen from his pocket. The gun was turned over to the officers by Helms three hours after the occurrence, the safety was off at that time and the gun was loaded with a full clip and a shell in the chamber. To the officers defendant stated that Breese and Brooks had insulted his wife, a woman friend and a waitress and had

attempted to date them. Defendant testified that Breese and Brooks were intoxicated when they had finished half their drinks and that he had refused to sell them any more; that they became angry and were cursing and that he ordered them out. He testified that he went to get his coat, came back and looked to see if they had gone, that they came back and grabbed him at the screen door and dragged him outside, that he was wrestling with both of them, that he did not draw a gun, although he had one, that he had gone that morning to pay a government tax of about $450 and to buy his beer and had a little over $1,000 with him and that he carried the gun with him on that trip but that he did not draw the gun on anybody at any time; that the padlock fell from the screen door as he was pulled through it but that he did not throw it at anyone. He further testified that when the officers interviewed him about 9 o'clock he had forgotten all about the difficulty, which had occurred at about 6 o'clock. However, during his interview he remembered it, gave an account of it, and admitted having thrown the padlock at the boy, but declared that the gun had been knocked from his pocket in the scuffle.

There was ample evidence to show that defendant was the aggressor. He testified to having ordered the sailors out of his place because one of them remarked, when Mrs. Womble was presented with a cake, "If I had a redhead like that I would buy her a cake too." Defendant testified that he considered the remark an insult. While he testified that he had had the gun in his pocket at all times, he also testified that he usually kept it in the room from which he got his coat immediately before the assault. The fact that he followed the sailors out of the place indicated that he was not averse to having further trouble with them. The gun was loaded, the safety was off, and the circumstances indicated that defendant was prepared to shoot when he followed the boys out of the place. The gun was not examined by anyone until some three hours after the affray, and from this fact it is argued that there was no evidence that it was loaded at the time it was taken from defendant. But it was a reasonable inference that it had been loaded when defendant carried it for protection earlier in the day; he did not testify that it was unloaded then or that it had been unloaded later. The manner in which it was used and the fact that the safety was off indicated that it was loaded. From the testimony of the witness Breese which we have quoted, the jury may reason-

ably have inferred that defendant was in the act of raising the gun to point it directly at Breese at the time the latter grabbed it. Defendant's claim that there was no evidence that he made use of the gun in the assault would have had much more weight with the jury and here if he had offered some reasonable explanation of his conduct. His testimony that he did not pull the gun and his statement to the officers that it was knocked out of his pocket in the scuffle were not reasonable in view of the fact that defendant was the aggressor and that the safety had been released, and they were directly contradicted by the testimony of the witness Helms, who was defendant's friend. The evidence was ample to support the implied finding of the jury that the elements of the offense had been proved, namely, that defendant attempted to use the gun upon the person of the complaining witness by either shooting or striking him and that he had the ability to do so. (*People* v. *Piercy* (1911), 16 Cal.App. 13 [116 P. 322]; *People* v. *McCoy* (1944), 25 Cal.2d 177 [153 P.2d 315].)

██ An instruction was given at the request of the People which correctly defined the term "deadly weapon." It is contended that the padlock was a deadly weapon, that the jury should have been instructed that defendant was not charged with using the padlock as a deadly weapon and that he may have been found guilty because he threw the padlock, although it may have been believed that he did not use the gun. The information, which described the pistol, was read to the jury, the verdict was that defendant was guilty as charged, and in view of the evidence we think the argument is without merit.

██ It is claimed that defendant was prejudiced by the giving of two instructions. These are not quoted in the brief nor identified in the transcript except in general terms. We understand they were the following: "In considering the following definitions you should remember that in every crime or public offense there must exist a union or joint operation of act and intent or criminal negligence. . . ." This instruction was in the language of section 20 of the Penal Code. The instruction is criticized because, it is claimed, the jury might thereunder have convicted defendant in the belief that he was guilty of criminal negligence. No useful purpose was served by including in the instruction reference to the element of criminal negligence in a case where that element was not involved. But the only disputed issues of fact were whether defendant used the gun and the manner

in which he used it, and those issues were clearly defined throughout the trial. The jury could not have been misled by the use of the term "criminal negligence" in view of the evidence and the ample instructions which covered specifically the elements of the crime charged.

The other instruction was the following: "In cases of assault with a deadly weapon, no specific intent is necessary to constitute the crime, and hence it is wholly immaterial whether the party was drunk or sober at the time of the commission of such offense, and intoxication is not a defense in such cases." The contention appears to be that under the latter instruction the jury might have understood that defendant could be found guilty even though he had no intent to commit an act of assault. The words "specific intent" as used in the latter instruction could very well have been amplified and their meaning made more clear, but the elements of the offense were clearly stated in other instructions and the jury were told more than once that the defendant must be acquitted unless the proof showed beyond all reasonable doubt "that the defendant actually assaulted the other person with the weapon, that is, made the assault with the weapon." Considering the evidence as to defendant's conduct, it cannot be said that the instruction was misleading or confusing.

Defendant's contentions that the testimony of the witnesses Breese and Brooks was inherently improbable and that the verdict was the result of passion and prejudice are answered by what we have already said. It is contended that the court should have instructed the jury of its own motion that they should not be influenced by any feelings of passion or prejudice against the defendant. Presumably the jurors were sufficiently intelligent to know this; if they were not, telling it to them could not have helped much.

The judgment and order denying motion for new trial are affirmed.

Desmond, P. J., and Wood (Parker), J., concurred.