[Crim. No. 681.   Fourth Dist., Nov. 2, 1949.]

THE PEOPLE, Respondent, v. EVELYN MARIE BECKER, Appellant.

Richard J. Weller for Appellant.

Fred N. Howser, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

GRIFFIN, J.—Defendant and appellant Evelyn Marie Becker was charged with the crime of arson in the burning of a dwelling house in Crestline, and with burning insured property with intent to defraud an insurance company. The jury convicted her on both counts. She appeals from the judgment and order denying her motion for new trial.

. Defendant and her present husband (Michael) were living in the house which was transferred to defendant and her former husband (Max Keller, now deceased) by joint tenancy deed in January, 1946. Shortly before his death he transferred his joint tenancy interest to another and at the time of trial litigation concerning the title to the property was pending.

On the night of October 24th, 1948, a neighbor of defendant, living about 52 feet from her property, was awakened by what she described as an "explosion," which blew out the windows of her house. She arose and saw high flames emanating from the house of defendant, particularly from the northeast corner of the building. She gave an alarm.

Another witness saw the fire and the entire rear portion of the house in flames. The wall was blown out. He tried the windows and doors but found them to be closed and locked.

The fire chief, who lived about 1,000 feet away, heard the explosion which sounded like a "muffled concussion." Several minutes later, when he arrived, the entire building had been

consumed by fire. The next day he made an inspection of the debris and discovered a "gas space heater" and alongside of it a piece of pipe which was a supply gas pipe to the space heater. The end of that pipe contained a valve which was described by the witness as being in the "on" position. In his presence was discovered two flare pots operated by wick and fuel oil. They were found covered with dirt, soot and debris under the northeast corner of the building. It was necessary for the caps on these flare pots to be off before they would burn. One was found with the cap off and the other was on. These flare pots are similar to ones used on highways as danger signals. They were found a short distance from the rear foundation walls and were 12 to 18 inches apart and several feet from where the gas space heater was located. An expert testified that he examined and measured the orifice that mixed the amount of fuel which went to the burner and that it was the standard house pressure and passed 20,000 B.T.U.'s per hour, and that perfect combustion for gas would require about 10,471 cubic feet of air for each cubic foot of gas; that when the gas reaches that proportion of air and an open flame is introduced a combustion will likely take place; that in a room 12 x 14 x 8 feet with all doors and windows closed and gas escaping at the rate described with an open flame at about floor level, it would take about seven hours to accumulate that mixture; that any changes of air would take longer (defendant stated she was away at the time of the fire; that she left Crestline about noon that day. The fire occurred about 10 p. m.).

An insurance agent testified that he sold defendant a policy of fire insurance on February 28, 1946, expiring February 28, 1949, in the name of *Max and Eva Keller*, husband and wife, covering two units located on the lots belonging to defendant, totaling $17,500. Eight thousand dollars was on unit No. 1 that burned, and $3,000 on the personal household property therein. On January 25, 1946, defendant and Max Keller executed a trust deed in the sum of $7,620 on the property, which was later assigned to one Dorosh, son-in-law of defendant. Dorosh testified that he never received any payments thereon and was instigating foreclosure proceedings thereunder, and on July 28, 1948, gave notice of default to defendant and notice that he was exercising his option to sell the property. He likewise stated that he saw the policy of fire insurance for $17,500, covering the property, in escrow when he purchased the trust deed. The

policy shows this change of first beneficiary thereunder as of July 29, 1948. On September 29, 1948, defendant, under the name of Keller, executed a note in the sum of $1,400, secured by a chattel mortgage on all her personal property and furniture, specifically describing each article, which note and mortgage ran in favor of the Seaboard Finance Company. After the fire defendant went to the finance company and wrote a letter to the insurance company to deduct the amount of that note from the proceeds of the policy payable on the furniture "that was burned up in my home," and ordered it paid to the finance company.

An insurance adjustor testified that defendant and her husband came to his office on October 25, about 2 p. m.; that she said she intended to present a claim for her loss and that he gave her his sympathy and asked if she had any knowledge as to how the fire originated; that she said she did not know. He told her he had examined the charred premises and that there was supposedly some explosion before the fire. She stated that she had visited the scene that day and that she was afraid someone was trying to "get even" with her. She was asked if she had had any trouble with the wiring or heating units; if she had left any of them on when she left, and she said "no"; that all were shut off. She then claimed that she had lost everything she owned in the fire, including clothing and household goods. She was asked if she had transferred any "stuff" from the Crestline home to Wilmar, where she had rental property, and she stated she had not with the possible exception of a wash rack or something of that type. The adjustor then asked her the type of house that was insured. She described it as a three-bedroom, two-story cabin, with a large living room, kitchen and bath, and with a half basement underneath; two large bedrooms upstairs; that they were all well furnished with good rugs, two or three radios, one combination phonograph player; about 400 records; a small bar; several bottles of expensive whiskey; lamps; a high oven kitchen range; ice box; and a bedroom containing an expensive *inlaid walnut brass-trimmed* bedroom suite; and that the bedrooms upstairs were completely furnished; that she also lost a collection of dolls imported from Austria; linen; a one-carat diamond ring valued at $1,400; and $950 in fifty-dollar bills. She stated she did not know Dorosh, the holder of the trust deed. She, through her attorney, about a week later, presented a schedule of the items lost in the fire, together with the estimated cost to replace the building. This schedule was received

in evidence and it itemized 10 rooms of furniture and equipment valued at approximately $12,000, which included dishes and glassware valued at more than $600, three radios, five beds with springs and mattresses, one described as a seven-piece set valued at $600.

The day after the fire she went to the office of the finance company and told the manager that everything she had was burned in a fire and that that included everything covered by his chattel mortgage. She stated that she was a widow and hoped to be married in the near future, and would sign a letter directed to the insurance company requesting it to pay $1,400 of the insurance money to the finance company.

The appraiser for the finance company testified that he saw the furnishings mentioned in the chattel mortgage in the Crestline home of defendant and that he saw the *inlaid walnut* bedroom suite there at that time, as well as a radio with an alligator skin case.

An arson investigator, duly qualified as such, testified that he only inspected fires to determine if they were of incendiary origin; that he arrived on the scene the next morning; that he was shown a space heater and pipe with the valve "turned on" and the flare pots. He testified that the men of the fire department sifted the debris and ashes from the burned building and discovered but very little glassware or dishes and that there were only two bedsprings, which would not burn; that early that morning defendant went to the premises with him for the first time and he questioned her about the space heater in connection with her heating system; that she stated none were in use; that as a result of the fire, she stated she had "lost everything I own in this world." He later asked her if her place was insured and she stated that it was. He then asked if she owned other property and she stated she owned a house and lot at Wilmar. He asked her if she had any other place rented. She stated she had been given permission to live in the Zinnen cottage in Crestline *since the fire.* She was asked if she had any furniture stored any place at all and she answered in the negative. He then asked her if she didn't know about a cottage rented at Arrowhead, known as the "Rickabaugh cottage." She evaded the question at first and then said she did. The investigator asked if she would take him to that house and she did. She led him and the deputy sheriffs to a padlocked garage door in which were stored a great number of boxes and cartons containing dishes,

hard liquor, many boxes of groceries, cooking utensils, silverware, portable radio *with alligator leather case,* books, many cartons of clothing, Christmas tree decorations, 50 feet of rubber hose, brooms, shovels and tools. They then went upstairs to the main part of the cottage which was found to be fully furnished and which included the very fine *inlaid walnut bedroom suite* which had been listed in the schedule of losses, together with certain dolls. There was also found a mahogany trimmed screen, bedclothing, satin comforters, table model radio, vacuum cleaner, personal pictures, red leather chair, electric heater, coffee table, throw rugs, bed with spring and mattress, floor lamps and many other items.

The investigator then testified that the agent for the finance company visited this cottage and identified the furnishings as those he appraised in the Crestline house which were listed as security for its loan. Defendant was asked why she did not live there as it was pretty well furnished. She did not answer this question. A check payable to Mr. Decker in the sum of $53.50, which defendant claimed was burned, was likewise found under a mat in this cottage.

Deputy sheriffs and others testified that they endeavored to locate defendant at the time of the fire but were unable to do so; that about 3 o'clock in the morning they located her and her husband at the home of defendant's then attorney in Crestline and questioned her about the fire. They testified that she stated she had locked the doors when she left and said "I lost everything I had in the fire . . . I don't have anything left, only the clothing I have on" and that she lost a $1,400 diamond ring in the fire and that her husband lost $900 and all his clothes and that all of their belongings "went up in the fire."

Witnesses were produced who testified that defendant and her husband, on the day of the fire, about 4:30 p. m. went to the Zinnen home next door to the Wilmar home owned by defendant but which was rented out to others. They stayed there until 8:30 p. m. The day after the fire they returned and asked Mrs. Zinnen to type a list of furniture destroyed, which she did do. This list was copied from a pencil memo furnished by defendant. Defendant was asked where she expected to live now and she replied that she would like to borrow the Zinnens' cabin in Crestline for a couple of weeks and this permission was given. The insurance policy here involved and personal papers of defendant were found in a

strong-box in the Zinnen cottage then occupied by the defendant.

A Mr. Rickabaugh testified that defendant, on October 8th came to his home and asked permission to rent his garage and unfurnished cabin and later returned on the 12th and rented it, giving her name as ''Bock.'' Although this house was about 40 feet from his home he never saw anyone moving furniture into it. Defendant refused a receipt for the rent and stated she was from Big Bear and had been staying with friends there. He asked her to sign up for the electric current but she told him to leave it as it was and she would pay him. This is the cabin where the furniture was found to be stored.

After the People rested their case defendant endeavored to account for the fire as being possibly due to two or three defects, one, overheating of the refrigerator; two, faulty wiring; and three, leaking gas jet. The refrigerator agent testified that overheating of the refrigerator would not cause a fire and that it would automatically shut off when overheated. Defendant claims she moved her furniture to the Rickabaugh cottage because of prowlers that frequented her Crestline home on several occasions and that she stated that ''is the main reason why I get married, for protection.''

The deputy sheriff stationed in that district testified that defendant never made any complaint to him about prowlers. Defendant then stated that she and her husband stayed some nights in the Rickabaugh cabin but went back to the Crestline home to eat. She endeavored to account for her actions in general and denied that she burned the property or intended to defraud the insurance company in any manner. Character witnesses were called in her behalf.

Defendant, on appeal, first contends that the evidence was insufficient to sustain the verdicts. Although the evidence was susceptible of a different conclusion the jury was justified in believing, as maintained by the prosecution, that the fire was of incendiary origin; that the gas heater in one room was purposely turned on and that a lighted flare pot was purposely placed in the room so that it would ignite the gas escaping from the heater and cause an explosion at some delayed hour. Defendant admitted being in the house up until noon on the day of the fire and on her departure she said she locked all doors and all windows were closed. Her actions and conduct, according to the evidence above related, and in not going to the scene of the fire that same night justi-

fies and fully supports the conclusion reached by the jury. (Pen. Code, §§ 447a, 450a; *People* v. *Miller,* 41 Cal.App.2d 252 [106 P.2d 239]; *People* v. *Gilyard,* 134 Cal.App. 184 [25 P.2d 35].)

It is next argued that there was no evidence tending to establish the corpus delicti prior to the admission in evidence of extrajudicial statements of the accused. There is no merit to this contention. (*People* v. *Holman,* 72 Cal.App.2d 75 [164 P.2d 297]; *People* v. *Roganovich,* 77 Cal.App. 158 [246 P. 132]; *People* v. *Saunders,* 13 Cal.App. 743 [110 P. 825]; *People* v. *Angelopoulos,* 30 Cal.App.2d 538 [86 P.2d 873].)

■ Counsel for defendant moved for a mistrial after claiming misconduct of a juror. The reporter's transcript shows that during a recess the juror remarked to one of the witnesses about his "being very alert." The witness asked her if she was a juror and being informed that she was the witness walked away. The fact that a witness impressed a juror as being alert would not necessarily indicate that she would regard his testimony in a more favorable light than it merited. The question of a mistrial was presented to the trial court. In exercising its discretion we perceive no abuse of that discretion in denying the motion. (*People* v. *Murphy,* 92 Cal.App. 729 [268 P. 927]; *People* v. *Galloway,* 202 Cal. 81, 92 [259 P. 332]; *People* v. *Quimby,* 6 Cal.App. 482, 490 [92 P. 493].)

■ The trial court instructed the jury in the language of section 20, Penal Code, that "In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence." It is argued that in the commission of the crime denounced by section 447a of the Penal Code the act must be both willful and malicious, and that the portion of the instruction in reference to "criminal negligence" has no application and is therefore erroneous, citing *People* v. *George,* 42 Cal.App.2d 568 [109 P.2d 404].

The court, in reading section 20 of the Penal Code, obviously referred to crimes generally and not to the particular one before the court. The instruction is correct as an abstract proposition of law. (*People* v. *Rowland,* 12 Cal.App. 6 [106 P. 428].)

In *People* v. *Womble,* 67 Cal.App.2d 885 [155 P.2d 838], a similar instruction was criticized for the same reason as here advanced and it was there stated that no useful purpose was served by including in the instruction reference to the element of criminal negligence, but concludes with the statement,

which is applicable here, that the jury could not have been misled by the use of the term "criminal negligence" in view of the evidence and the ample instructions which covered specifically the elements of the crime charged. Instructions substantially in the form of CALJIC Instructions Nos. 902, 904, 906 and 907 were given. No prejudicial error resulted.

Defendant's refused instructions were to the effect that it must be found that the fire was set and started intentionally and was not accidental, and that in the crime of burning insured property there must be a specific intent to defraud the insurance company. The court gave instructions practically in the same language as sections 447a and 450a of the Penal Code as well as the instructions above noted from CALJIC. Every element of the refused instructions were contained in the instructions given. The court did not err in declining to repeat them. (*People* v. *Ramsey,* 83 Cal.App.2d 707, 727 [189 P.2d 802] ; *People* v. *Bickerstaff,* 46 Cal.App. 764, 775 [190 P. 656].)

Complaint is made because the court gave a definition of the word "willfully" as set forth in section 7, subdivision 1 of the Penal Code, citing *People* v. *Snyder,* 15 Cal.2d 706 [104 P.2d 639]. It is argued that the giving of such an instruction is reversible error. The sections of the Penal Code under which defendant was charged recite that the person who so acts must "*willfully* and maliciously" set fire to "any dwelling house" or "Any person who *willfully* and with intent to injure or defraud the insurer sets fire to . . . goods, wares," etc., is guilty of a public offense. In *People* v. *Geibel,* 93 Cal. App.2d 147 [208 P.2d 743], it was held that it was error in a forgery case to define the word "willfully" in connection therewith. In Penal Code, section 470 (the forgery statute), the word "willfully" is not stated as a necessary element. It was said in 4 California Jurisprudence, Ten-Year Supplement (1944 Rev.) section 376, pages 810-811, that there is no error in giving such an instruction together with an instruction in the language of Penal Code, section 20, in a case in which they may properly be applied. *People* v. *Saunders,* 61 Cal.App. 341, 345 [215 P. 120], is given as authority for the statement that "When taken as a whole the instruction was but a definition of the word 'willfully.' Moreover, it was a definition which was not improper to be given to the jury, even though it be granted that the giving was not strictly necessary. It was proper for the reason that the information

charged that appellant 'willfully and unlawfully' committed the acts alleged against him.'' It was there held that there was no error in giving both of such instructions in proper cases.

■ Defendant objects to a question asked of the expert concerning the length of time required to obtain an explosive mixture of gas under certain conditions. It is contended that his opinion was based on an assumed state of facts not in evidence because the building was entirely destroyed by fire and there was no testimony as to the size of the room or the location of the flare pots or the gas space heater, and that there was no evidence that the flare pots were burning or that they were in the same room prior to the time of the fire. The jury had the right to draw reasonable conclusions from the evidence produced, both circumstantial and direct, i.e., the position and location of the gas space heater and flare pots discovered in the debris in relation to the rooms described by the witnesses. A fire resulted without question, and there must have been a flame somewhere to cause the explosion.

■ While the hypothesis contained in the question should have some evidence to sustain it, the question may be framed on any reasonable theory which can be deduced from the evidence and the statement may assume any facts, within the limits of the evidence, upon which the opinion of the expert is derived provided the question is not unfair or misleading. (*Hutter* v. *Hommel*, 213 Cal. 677, 680 [3 P.2d 554]; *Treadwell* v. *Nickel*, 194 Cal. 243, 267 [228 P. 25]; *People* v. *Wilson*, 25 Cal.2d 341, 349 [153 P.2d 720]; *Guardianship of Jacobson*, 30 Cal.2d 312, 324 [182 P.2d 537].) The facts assumed for the purpose of the question were sufficiently warranted by the evidence.

■ ■ The next complaint is that the oral comments of the trial court during the course of the trial and in the presence of the jury were prejudicial to the defendant and exceeded the right of the court to comment on the evidence. The transcript of defendant's testimony on cross-examination showed a previous inconsistency as to whether she did or did not have a certain conversation. In a question propounded by the court defendant finally admitted having such a conversation. The trial judge asked her ''why she hadn't said so.'' Objection was made to the court's question. It was overruled and the court remarked to counsel: ''I am not going to have this witness answer questions twice, give two different versions, without some explanation.'' On cross-examination

of a defendant a trial judge is authorized to call the defendant's attention to apparently conflicting statements and give him an opportunity to explain or reconcile them. (*People* v. *Butterfield,* 40 Cal.App.2d 725 [105 P.2d 628].) Apparently this was the purpose of the question. The second remark was addressed to counsel for defendant in overruling the objection and not to the jury or to the witness. The trial court instructed the jury that it was the exclusive judge of the credibility of the witnesses. While the remark may have been better unsaid in the presence of the jury we are convinced that no prejudicial error resulted. Other remarks were cited as error. We have examined them and find that no prejudicial error resulted. The remarks of the court were not cited as misconduct at the time. (*People* v. *Knocke,* 94 Cal.App. 55, 57 [270 P. 468].)

In one instance the trial judge told counsel for defendant that his question was not intelligent and endeavored to explain why he thought so. Exception is taken to this. We see no merit to this exception.

Finally, it is claimed that the court erred in denying the motion for new trial based upon the errors here alleged. This claim has been fully covered in disposing of those claimed errors.

Judgment and order affirmed.

Barnard, P. J., and Mussell, J., concurred.