[Crim. No. 4367. Second Dist., Div. Three. Nov. 30, 1949.]

THE PEOPLE, Respondent, v. OPHELIA McSPADDEN et al., Appellants.

Philip S. Schutz and Alexander L. Oster for Appellants.

Fred N. Howser, Attorney General, and Kent C. Rogers, Deputy Attorney General, for Respondent.

WOOD, J.—Defendants were charged in count I of an information with arson, in that, they unlawfully set fire to a dwelling house at 1401¼ East 15th Street in Los Angeles; and they were charged in count II thereof with unlawfully burning insured property, namely, furniture in said house. Trial by jury was waived. Defendants were convicted on both counts, and they appeal from the judgments and from the orders denying their motions for a new trial. They assert that the evidence was insufficient to support the judgments.

The house involved here is a small wooden building (a part of a bungalow court) consisting of a front room, a middle room (dining room), kitchen and bathroom. On October 13, 1948, about 11:45 p. m., a fire chief and some other firemen arrived at said house in response to a fire call which was received at 11:43 p. m. The chief testified that he observed a fire in the front room which was burning a built-in desk in the southwest corner of the room and was burning a bed which was near the desk. He also observed a fire in the middle room which was burning a built-in chest of drawers on the north side of the room and was burning the back of a davenport which was about one foot from the chest. The fires were about 15 feet apart and were entirely inside the house. He examined the electrical wiring in the rooms but he did not find anything unusual about it. The davenport, the bed, and some clothing, which had been partially burned, were carried outside the house. The fires were soon extinguished. No one was in the house when the firemen arrived, and neither defendant was on the premises at the time of the fire.

Another fireman, Mr. Crosby, who is attached to the arson bureau, arrived at the house about 12:15 a. m. on October 14th (about 30 minutes after the other firemen arrived). He testified that he observed, in the front room, a heavy chair in the southwest corner of the room, and also a chiffonier, and some clothing on it (which had not been burned). Outside the house, he saw a davenport, a bed, and some clothing, that had been partially burned. He testified further that the two fires were about 15 feet apart; there was no connection between them; there was no electrical wiring in the fire area which might have caused the fire; in his opinion the fire was not of accidental nature, but the fires were caused by human hands and were set at the same time. After he had been there about 15 minutes he went to a house next door and saw the defendant Ophelia talking on the telephone and he heard her say that she had suffered a fire, she would not be able to work, and she had lost

all her clothing in the fire. In a conversation with her, after she had finished telephoning, she said she lived in the house where the fire occurred, she had divorced her husband in January, 1948, and the court had awarded the furniture to her and ordered her husband to pay the mortgage which was on the furniture. She also said she had no idea where her husband was, that she had not seen him "for quite some time," that it was impossible to find him, that he had failed to keep up the payments on the furniture and she had decided to permit the finance company to take the furniture back but a representative of the company told her that the company would not take it back but would garnishee her wages to obtain payment of the note. She said further that she worked in Beverly Hills doing housework and that she returned home at night; that on the night of the fire she arrived in downtown Los Angeles about 9:30 p. m.; then she visited a girl friend on Central Avenue for a few minutes; then she went to a restaurant at 18th and Central; and then returned to her room at the Colonial Hotel (which is two doors from the house where the fire occurred) and went to bed about 10:30 p. m. She said she rented the room in that hotel at 8 a. m. on the day of the fire and she had "only got to take" three or four skirts and a blouse to the hotel room; she rented the hotel room because she had been served with an eviction notice and because her husband had told her by telephone the night before the fire that he was going to sell the furniture; she had been paying $18 a month as rent for the house and her rent for the house was paid until October 22d; and she was paying $11 a week for the hotel room. She said that when the finance company would not take the furniture back she had the monthly payments on the furniture reduced and at that time the company wrote a $1,200 insurance policy covering the furniture. Mr. Crosby testified further that he then went to her hotel room and saw three or four skirts, a jacket and a blouse there; that when he started to examine the bureau she said there was nothing in it; that he found a waffle iron therein, and she said she brought it there because it was a present and she always kept it with her; that the bed was made and it did not appear as if anyone had been lying on it. In a conversation with her the next day at his office, Mr. Crosby told her that from the appearence of her bed soon after the fire he did not think that she was in bed at the time of the fire. She replied

that she always slept on one side of the bed and never ruffled the other side and never used a pillow, and when she got out of bed she always laid the covers back and put the pillows in proper place. When he asked her if she thought that was the normal thing to do if she were awakened by a fire she did not say anything. Mr. Crosby and another fireman examined the hotel room on the day after the fire and found therein a clock, several pictures, and a pillowcase filled with clothing and linen. In a further conversation with her the day after the fire, Mr. Crosby asked her if the blankets and bedspread on the bed and the two folded bedspreads in the hotel room and the clock, pictures, and clothing therein were hers, and she replied that they belonged to her. He told her that he had talked with her husband and had learned that several of her statements were not true, and he (Mr. Crosby) asked her to tell the truth. She then said she had lived (in the house where the fire occurred) with her husband (defendant Edward McSpadden) from May until the first week in October, 1948, that on the night of the fire she met him at 8th and Central about 10 p. m., then they went to a café and drank coffee, then he accompanied her to her hotel room, that he left there about 10 minutes later and she went to bed. In response to a question regarding the keys to the house where the fire occurred she said she had the only key but the door could be opened by reaching through a broken windowpane next to the door. He then showed her a window screen which he had taken from that window, and she then said she had taken that screen from another window and placed it over the window next to the door in order to cover up a hole in the pane. He asked her why she registered at the hotel under the name of Smith, and she said she had registered that way so that her husband would not be able to find her. She also said that on the night of the fire she wanted to tell Mr. Crosby that she had been with her husband that night, but she was afraid to tell him because he might think she was implicated in the fire; that as soon as she saw the house afire she felt "it had been set" and that is why she "lied."

Mr. Wiesinger, an investigator for the arson bureau, testified that about noon on October 14th (the day after the fire), while he was at the place of the fire, the defendant Edward McSpadden came there and stated as follows: He had lived there. The furniture was owned by him and his wife. They had separated and he had moved out on October 3d and had gone to the Woods Hotel and had not seen his wife since then.

He did not know whether she was still living there. He believed that she had insurance on the furniture. On the day of the fire he called his wife in Beverly Hills and told her that he was going to sell the furniture and he was going to the house to clean the furniture. He went to the house at 11 a. m. and finished cleaning the furniture about 3 p. m., and then he locked the door and went away. He did not have a key to the house, but his wife left the door open for him. On the night of the fire he went to work at 10 o'clock in the produce market at 8th and Central, and he had not been near the house after he had finished cleaning the furniture in the afternoon.

Mr. Wiesinger also testified that about an hour after said first conversation the defendant Edward said that his wife had met him downtown about 8 :30 p. m. on the night of the fire and they had coffee in a restaurant and then he walked with her to her hotel room.

The manager of the Colonial Hotel testified that she rented a room in the hotel to defendant Ophelia on October 13, 1948, between 7 a. m. and 8 a. m. and that she registered under the name of Ophelia Smith.

In February, 1948, Ophelia was granted an interlocutory decree of divorce from Edward, and the court awarded the furniture to her and ordered him to make the monthly payments of $33.75 which were payable under a mortgage on the furniture. Thereafter the defendants lived together at the house involved here from May to October 3, 1948. On said last mentioned date Edward went to live at the Woods Hotel where he registered under the name of Edward Cane. He testified that he registered under that name so that Ophelia could not find him. Ophelia lived at said house from 1940 until October 13, 1948, when she moved to the Colonial Hotel. She testified that she registered there under the name of Ophelia Smith so that Edward could not find her.

On May 18, 1948, Ophelia made a new mortgage covering the furniture at said 1401¼ East 15th Street, which mortgage provided for monthly payments of $27.70. The mortgagee was a finance company. Ophelia was the borrower and she signed the renewal application and the mortgage. At the time of making the new mortgage, she obtained, upon request of the finance company and through it as agent, the fire insurance policy involved here. The policy, which was issued in May, 1948, by the American Home Fire Assurance Company, stated that said company insured "Ophelia McSpadden and/or Edward

McSpadden,'' to the amount of $1,250, against damage by fire to the household furniture and personal belongings located at 1401¼ East 15th Street, Los Angeles, for the period of time from May 15, 1948, to May 15, 1951. The policy was in effect on October 13, 1948. At the time of the fire about $200 was unpaid on the mortgage.

Defendant Edward McSpadden testified that he went to the house on October 13, 1948, about 11 a. m., and proceeded to clean the furniture and to put things in order preparatory to a sale of the furniture. The furniture had been awarded to Ophelia in the divorce case, but he had her permission to offer it for sale. He was going to sell the furniture and then pay to the finance company the unpaid balance of $200. The remainder of the proceeds, if any, he was going to give to his wife. He left the house about 3 p. m. on the day of the fire. That night, about 8 o'clock, Ophelia came to 8th and Central where he was working as a swamper (loading and unloading trucks), and they had lunch together and then they walked to her room at the Colonial Hotel. He worked at 8th and Central from 10 o'clock to 4 o'clock the night of the fire. His wife informed him that the house had burned, and he went to the house on October 14th about 10 a. m. to see about the furniture he had arranged for sale. While he was there he was arrested. He denied that he told investigator Wiesinger that he had not seen Ophelia after he moved from the house, and he denied that he told him anything concerning insurance on the furniture. He testified that he told the investigator that he saw her the day of the fire. He also testified that he did not light a fire in the house on the day of the fire or at any time with the intention of burning any part of the house or furniture. On cross-examination he testified that on the night of the fire he was in her hotel room about five minutes. He did not know about the insurance policy and did not know the furniture was insured. When he was arranging the furniture for sale, the day of the fire, the combination radio-phonograph, the refrigerator, the chrome table and four chairs (which were in the house at the time he moved away on October 3d) were not there. All the furniture that was covered by the mortgage was in the house at the time he arranged the furniture for sale. He did not owe his wife any money for support under the court order, but he was required under the order to pay the loan on the furniture. He did not have an offer to buy the furniture, but a man was going to look at it.

Defendant Ophelia McSpadden testified that she moved from the house to the Colonial Hotel about 7 a. m. on October 13th, and that she moved because she had received two eviction notices. She took with her a bag of linen, a waffle iron, a floor lamp, a bedspread, a blanket and some clothes. The lamp was included in the mortgage. The refrigerator was not mortgaged, and her sister was keeping it for her. On October 13th, about 8 a. m., she arrived at 208 North Mateo Street, Los Angeles, where she was employed as a housekeeper. She did not return, during that day, to the house where the fire occurred. She finished her work that day about 7:45 p. m., then she visited a girl friend about 15 minutes. She met her husband about 9 p. m. and went with him to a café, and then they walked to her hotel room. He stayed there about five minutes. She did not leave the hotel that night until she heard the fire engines. When she heard them she jumped out of bed, put on a robe and went to the fire. A fire occurred at the same house in the preceding year, and at that time there was a fire at the front door and a fire at the back steps, and she suspected that one Catherine Cox, who had threatened to ''get even'' with her, had started those fires. She (Ophelia) locked the house when she moved from it, but ''practically everybody around'' knew that the door to the house could be unlocked by reaching through the broken windowpane next to the door. She was earning only $90 a month and she could not continue the payments on the furniture, and she talked with her husband about selling the furniture and then paying the furniture bill. He said he would go to the house and take care of the sale for her because he knew more about getting a buyer. She testified that she did not set fire to the house or the furniture.

The evidence shows that the fires were of incendiary origin. Defendant Ophelia made many untruthful statements in reply to material inquiries by the investigators. Soon after the fire she told them she had not seen her husband for quite some time and it was impossible to find him; but later she told them, and she also testified, that she had been with him on the night of the fire, and that he could be found at the produce market at 8th and Central Avenue. She told them that she worked in Beverly Hills, and she testified that she worked in Los Angeles (at a place not far from her home). She told them there was nothing in the bureau in her hotel room, when in fact her waffle iron was in it. Her statement to the effect that she was in bed when the fire engines arrived was

refuted by the unused appearance of the bed when it was observed by the investigators a few minutes after the fire. Her statement that the front door of the house could be opened by reaching through a hole in the windowpane was refuted by the fact that she had put a screen over the hole. Her consciousness of guilt was indicated by her statements that she was afraid to tell, on the night of the fire, that she had been with her husband because the investigators might have thought she was implicated in the fire; and that she "lied" to the investigators because she felt that the fire had been set. Preparation for the fire was indicated by the facts that she moved from the house shortly before the fire occurred; that she took with her most of her clothing, some bedspreads, blankets, pictures, and other personal belongings; that she removed the refrigerator, radio-phonograph, and chrome table and chairs from the house; and that all the mortgaged furniture (except a lamp) was left in the house.

There was conflicting testimony regarding the statements which defendant Edward made to investigator Wiesinger the day after the fire. According to testimony of the investigator, the defendant Edward told him that he had not seen his wife since he moved from the house on October 3d; that he believed she had insurance on the furniture; and that he had not been near the house after he had finished cleaning the furniture in the afternoon of October 13th. Defendant Edward denied that he made those statements. It was for the trial court to determine what facts were established by the evidence. Apparently the trial court found that Edward made the statements which the investigator testified that he made. It appears therefore that Edward made a false statement to the investigator to the effect that he had not seen his wife for about 10 days, when in fact he had been with her on the night of the fire; and that he also made a false statement to the effect that he had not been near the house after he finished cleaning the furniture in the afternoon, when in fact he had been at his wife's hotel room (two doors from that house) on the night of the fire.

Appellant Edward argues that there was no evidence that he knew the furniture was insured. The trial court could have inferred reasonably that he had such knowledge. There was evidence that he told the investigator on the morning after the fire that he believed there was insurance on the furniture. He was named in the policy as one of the insured. He was

obligated to pay for the furniture. He made false statements regarding material facts.

The trial court could have inferred reasonably from the actions, conduct and false statements of the defendants that the defendants committed the offenses charged. (See *People* v. *Becker, ante,* p. 434, 441 [210 P.2d 871].) The evidence was sufficient to support the judgments and orders.

The judgments and the orders denying the motions for a new trial are affirmed.

Shinn, P. J., and Vallée, J., concurred.