[Crim. No. 374. Third Appellate District.—October 8, 1917.]

## THE PEOPLE, Respondent, v. H. STANLEY CRANE, Appellant.

CRIMINAL LAW—EMBEZZLEMENT BY ATTORNEY—OWNERSHIP OF MONEY MISAPPROPRIATED—ERRONEOUS REFUSAL OF DIRECTED VERDICT—ERROR CURED BY DEFENDANT'S SUBSEQUENT TESTIMONY.—Where the money alleged to have been misappropriated by an attorney, who received it for the purpose of hiring detectives in a divorce action, was shown to have been handed to the accused by a third person and not by the prosecutrix, it was error for the court to refuse a directed verdict at the close of the state's testimony, but the error was rendered harmless by the defendant afterward taking the stand himself and testifying that this third person had loaned the money to the prosecutrix to pay the expenses of her case, including the employment of detectives.

ID.—EVIDENCE—ERRONEOUS REJECTION OF TESTIMONY.—One of the defenses being that the money was intended to include fees for legal services in other litigations, it was error to reject expert testimony as to the reasonableness of the defendant's charge for those services.

ID.—ERRONEOUS REJECTION OF TESTIMONY TO REHABILITATE AN IMPEACHED WITNESS.—Where a stenographer employed by the defendant gave material testimony in his favor but was impeached by testimony that she had stated while on a visit to a hospital that in testifying before the grand jury she had lied for the defendant, and the defense offered to show that the impeached witness had

visited the hospital only once, and then as the bearer of a check from the defendant to a patient in the hospital, and that this check was cashed before the grand jury met, and she was allowed to state that her visit to the hospital was before the hearing by the grand jury, but her testimony as to the reason for her visit to the hospital was rejected as hearsay, the rejected testimony was relevant to fix the time of the hospital visit and its rejection was prejudicial.

ID.—INSTRUCTIONS.—Although the jury was instructed in the general language of section 511 of the Penal Code, it was error to refuse to supplement this by a requested instruction that if the jury found that the prosecutrix paid the defendant the amount in question on account of fees, costs, and expenses in her divorce case, they must find the defendant not guilty.

APPEAL from a judgment of the Superior Court of San Joaquin County. John Hancock, Judge.

The facts are stated in the opinion of the court.

Ben Berry, and La Fayette J. Smallpage, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

BURNETT, J.—The appellant, H. Stanley Crane, was charged by indictment of the grand jury of the county of San Joaquin with the crime of embezzling the property of Mrs. Helen Kleppel. He was thereupon duly tried and convicted of the crime charged. Defendant moved for a new trial, which motion was denied, and he was thereupon sentenced to imprisonment in the state prison for a term of five years. Defendant prosecutes this appeal from the order and the judgment.

The defendant, an attorney at law, was retained by Mrs. Helen Kleppel, the prosecuting witness, to obtain a divorce. It appearing that Mrs. Kleppel's husband contemplated fighting the divorce by cross-complaining that Mrs. Kleppel had been improperly intimate with one Frank Kaplan, defendant decided that detectives would be necessary not only to disprove such a charge against Mrs. Kleppel but to prove a like charge against her husband. For this purpose, claims the prosecuting witness, defendant demanded four hundred dollars, which was finally obtained through Kaplan and paid defendant, he having received prior to that time but twenty

dollars to cover the costs of commencing suit. It is this four hundred dollars which it is charged defendant embezzled. Defendant claims that the money was paid to cover his fees and expenditures in the case as well as detective hire, and that its use lay in his discretion. In opposition to this Mrs. Kleppel seems to have confusedly taken three positions. It appears that at this time defendant was also retained by Mrs. Kleppel's father, H. Buccholz, to collect several debts against Kleppel, amounting to some one thousand six hundred dollars, as well as to render other legal services. For these services Buccholz was charged $385. Mrs. Kleppel claims that it was understood that this charge was to include defendant's fee for services in the divorce action. She also claims that defendant promised to conduct her case gratuitously. And she seemed at times to be of the impression that defendant was charging her for her divorce, some eight hundred dollars (the four hundred dollars for detectives and the amount properly chargeable to her father). Defendant claims that no such agreements were had, that the work done for the father was entirely separate and well worth the fee charged, thereby strengthening his claim that the four hundred dollars covered only reasonable divorce fees and costs.

Defendant assigns as grounds for reversal: First, that the court erred in the decision of questions of law arising during the course of the trial, in that it denied defendant's motion for a directed verdict, and in that it made erroneous rulings as to the admissibility of evidence; second, that the court erred in instructing the jury, and, third, that the verdict is contrary to the law and the evidence.

At the close of the prosecution's case in chief defendant moved for a directed verdict of not guilty on the ground that it had not been proved that the four hundred dollars was the personal property of Mrs. Kleppel, but that it was supplied by Kaplan; and that even if it were Mrs. Kleppel's property, it had not been proved that no detectives were employed.

The only evidence appearing as to the ownership of the money, at the time the motion was made, is as follows:

"Mr. Foltz: Q. Just state what, if any, conversation there was between you and Mr. Crane the first time, about the four hundred dollars? A. He stated I had to clear myself of that, and have to prove Kleppel's guilt; I told him I was innocent, and it was up, though, to let Mr. Kaplan know about it. So

he went with me that evening out to Kaplan's ranch. Mr.
Kaplan not being there, we had to go to the Waterloo road;
he was working at a place there.

"Q. Never mind that part of it, that first conversation.
Was there any more said between you and him than what you
mentioned now—what you just mentioned—anything said
about any amount? A. He said he needed four hundred dol-
lars; I asked him what he wanted it for; he said he needed
four hundred dollars for that; I said I didn't have that money.

"Q. Did he tell you at that time what he needed it for?
A. He said for detective work.

"Q. Did he say how many? A. He said he had to hire
two detectives.

"Q. For what purpose, did he state? A. Proving that I
was innocent, and finding Kleppel guilty.

"Q. Then you say you went out to the Waterloo road to
Frank Kaplan's place. A. Yes.

"Q. How far does he live from where your father lives and
where you lived? A. About four miles; that is, on the Linden
road. He was staying at that time on the Waterloo road,
helping some friends out.

"Q. State whether or not there was any conversation there
with Mr. Kaplan and Mr. Crane and you. A. He asked me
to go in and get Frank out; then he took Frank up to our
ranch, away up on the Linden road, and he had a talk with
Frank, and got in the machine at the time.

"Q. What was said at that time? A. He asked Frank if
he was guilty; he stated no; he said we were both innocent
of the charge; and he said, well, he had to prove that and he
had to have detectives, and that I was to raise four hundred
dollars. Then he wanted Frank to raise it, and he said he
didn't see what he had to do with it, he was innocent. Then
he says I had to raise that, that was all there was to it. Then
he forbid me mentioning the subject.

"Q. What, if anything, did he say to Frank there at that
time? A. Well, . . . he spoke to Frank a few minutes while
I went in the house. . . . He told Frank if he didn't clear him-
self he would be a ruined man. . . . Frank told him he didn't
have the money either; neither one of us had it. . . .

"Q. Then when he got to the Kaplan ranch (subsequently)
who did you see? A. He spoke to Mr. Kaplan a long time
behind the barn. In the meanwhile Frank went in the house

and dressed, and when he came out I asked where he was going; he said he was going to see if he could borrow money from some friend, and then proceeded out to Sperry's Addition and the money was borrowed from a gentleman out there; I don't know the name. . . .

"Q. Did you see the money paid over? A. No, I didn't see any of that. The only thing I seen was when Frank laid the check down in Mr. Crane's office, on Mr. Crane's desk. . . .

"Q. How much was this check for? A. For four hundred dollars.

"Q. Who gave that to Mr. Crane? A. Frank gave it to Mr. Crane."

And later the prosecuting witness testifies: "Of course that was the first time he [her father] had heard anything of it, because he had not even known that Frank was paying for these detectives."

Frank Kaplan's testimony appears from the following:

"Q. Just go on and tell all he said about that. A. Well, he said that I would have to clear myself, and the only way to do it would be to raise enough money to employ a couple of detectives to get evidence against Mr. Kleppel; and he said that Mrs. Kleppel didn't have any money, and he thought being that I had been mixed up with it, I ought to help raise the money; and I told him at the time I had nothing whatever to do with it, and that I had no money. So then Mrs. Kleppel—

"Q. Did you tell him at that time whether—what else did you tell him? Go ahead. A. Then Mrs. Kleppel, she wanted to try to raise the money to clear us. Then they went away that night."

"Q. What, if any, conversation took place at that time between you three? A. Well, he stated that Mrs. Kleppel couldn't get the money, and they wanted me to try and raise the money. . . .

"Q. Well, was there anything finally done about the money at that time? A. Yes.

"Q. What was done, what agreement was made between you if any? A. Well, I borrowed the money. . . .

"Q. Then what did you do after you got the four hundred dollars, what did you do with it? A. I deposited it in the bank. . . .

"Q. State whether or not any money was paid—if any check was given to Mr. Crane after that time, after you put the money in the bank. A. Yes, sir."

There is nothing in this testimony to suggest that the money was loaned by Kaplan to Mrs. Kleppel. In fact, it would indicate just the contrary, that Kaplan borrowed the money and himself paid it as a matter of self-protection. The fact that subsequently Mrs. Kleppel voluntarily promised to and did reimburse Kaplan is of no consequence, and does not serve to disprove that at this time the money paid was Kaplan's. There being no legally sufficient evidence, therefore, to prove that the money alleged to have been embezzled was Mrs. Kleppel's personal property, the court erred in denying appellant's motion for a directed verdict, and such error is reversible unless subsequently cured. But the required evidence was thereafter supplied by the defendant himself, and we cannot say, therefore, upon the whole record that defendant was prejudiced in said ruling. After testifying that Mrs. Kleppel had spoken to Kaplan about borrowing the money, and that Kaplan had said "he would go to town and raise the money there, or borrow the money there, and would make her the loan," he adds, "I tried to explain to Mr. Buccholz Frank Kaplan had loaned her money to pay the general expenses of her case; that included the employment of detectives." While this evidence is indeed meager, it leaves no doubt in our minds that defendant understood and intended to state that the money was loaned by Kaplan to Mrs. Kleppel. It must have been so understood by the jury, and we cannot say that the conclusion is unwarranted and the error not cured.

Without setting forth the evidence tending to prove that no detectives were employed, it is enough to say that it was sufficient, and although it is of a negative character, this was about the only sort of evidence left open to the prosecution. But here again if we admit that the showing for the people was somewhat inadequate, it was aided by the testimony of the defendant. He admitted that he appropriated $204 of the four hundred dollars, his claim being that he was entitled to do so under his contract with Mrs. Kleppel. The jury had the right, however, to accept her version of the contract and his as to the use of the money. The amount which he thus admits to have appropriated would satisfy the requirement of

the indictment, and in connection with the terms of the trust would make out the offense.

Appellant contends that the court erred in rejecting the testimony of George R. McNoble, an attorney at law, attempted to be used as an expert by defendant. After stating to McNoble in a hypothetical question all the legal services that appellant had rendered Mr. Buccholz, he was asked what he believed would be a reasonable attorney's fee. A general objection to the testimony was sustained. As to this appellant claims that the reasonableness of his charge for the services in the Buccholz case had an important and relevant bearing upon the question whether he would probably undertake other services without additional remuneration. This is based supposedly upon the theory that lawyers usually charge all that their services are reasonably worth. However, they are not to be distinguished in that respect from the members of other professions or occupations. The rule seems to be that where an express contract is asserted on one side and denied on the other, evidence of the reasonable value of the services is not admissible to affect the probability that an express contract was executed. When it is admitted, however, that an express contract was made, but there is a disagreement as to the amount agreed upon, then such evidence is deemed proper and important. One claim of the prosecuting witness was that there was a contract for a certain amount, but it was to cover two cases. The defendant, on the other hand, insisted that it was intended simply to include his services in the Buccholz case. Do not these opposing contentions involve the consideration of what was the amount to be paid for each of these cases? And are we not thus confronted by a situation similar to the one mentioned above wherein such evidence is held to be admissible? In other words, it was the contention of appellant that it was agreed that his fee for the Buccholz case was to be the sum of $385 or about four hundred dollars, whereas the effect of the testimony of the prosecuting witness is that it was to be less than that, since a portion of it was to cover the other case. We therefore have a case for the operation of the rule announced in *Ellis* v. *Woodburn*, 89 Cal. 129, [26 Pac. 963], and we think the evidence should have been received.

Appellant claims that he was prevented from rehabilitating witness Helen Spaulding. Miss Spaulding had testified that

as stenographer of appellant she had overheard the latter tell Mrs. Kleppel that his charge in her divorce case would be five hundred dollars, and that she knew the detectives who had been employed. She was, as is easily to be seen, a very important witness for appellant. She was impeached by the testimony of one Mrs. F. G. Schneider, to the effect that after testifying before the grand jury Miss Spaulding had come to the Dameron Hospital and there stated that she had lied for Crane. Appellant thereupon attempted to show that Miss Spaulding had visited the hospital but once as the bearer of a check from Crane to a patient therein, that this was before the hearing before the grand jury, as would be shown by the fact that the check was cashed before the grand jury met. Though Miss Spaulding was allowed to state that her visit to the hospital had been made before the hearing of the grand jury, any testimony as to why she was sent was rejected as hearsay. It is obvious that had this important witness been allowed to answer the question, her rehabilitation in connection with what subsequently could have been shown would probably have been complete. The evidence sought was not subject to the objection of hearsay. It was not offered to prove the truth or falsity of the matters therein contained, but merely as a collateral circumstance relevant to fix the time at which the witness had visited the hospital, and its rejection was as harmful to defendant as the impeachment itself must have been.

As to the instructions requested by appellant and rejected by the court, consideration need only be accorded to one, since the others were covered by instructions given. Appellant requested that the jury be instructed: "If you find from the evidence in this case that Mrs. Kleppel paid the defendant the four hundred dollars on account of fees, costs, and expenses in her divorce case, you must find the defendant not guilty." The instruction very clearly contains the gist of appellant's defense. It states the theory upon which the defense was largely conducted. His contention was that he received the money for expenses and to cover his fee. The only evidence in opposition to this was the testimony of the prosecuting witness whose reputation as to truth, honesty, and integrity was bad. In fact, we may say that the case upon its merits is not entirely clear. The showing for the people was rather weak and unsatisfactory. It seems, therefore, es-

pecially important that every legal right to which he was entitled should have been accorded to appellant, and we think the jury should have been specifically instructed as requested in reference to this vital contention as to his understanding of the agreement and his appropriation of the money. The general instruction in the language of section 511 of the Penal Code ought to have been supplemented, as suggested, in order that the jury might be fully advised as to the legal bearing of appellant's claim.

We are not prepared to say that the evidence is altogether insufficient to support the verdict, but for the reasons stated we think the judgment and order should be reversed, and it is so ordered.

Chipman, P. J., and Hart, J., concurred.