[Crim. No. 1421. Fourth Dist. Apr. 18, 1960.]

THE PEOPLE, Respondent, v. PHILLIP NEWTON
McMANUS et al., Appellants.

Thomas Whelan, Enright, von Kalinowski & Levitt, William B. Enright, Stanford & McDonough, Joseph P. McDonough, Reed, Vaughn & Brockaway and Richard L. Vaughn for Appellants.

Stanley Mosk, Attorney General, Elizabeth Miller, Deputy Attorney General, James Don Keller, District Attorney (San Diego), John Van Benthem and Jack Lovett, Deputy District Attorneys, for Respondent.

SHEPARD, J.—This is an appeal from judgments of conviction, orders granting probation, and orders denying motions for a new trial.

Defendants McManus, Pounds, Hause, Freeman, Shelley and Scottie Mortgage and Loan Company, a corporation, hereinafter called ''Company,'' were charged by an indictment returned by the San Diego County Grand Jury in Count I thereof, with criminal conspiracy to cheat and defraud by criminal means, to obtain money and property by false pretenses and false promises with intent not to perform such promises, and to commit theft, as is set forth in said indictment. Fifteen overt acts were alleged. In Count II thereof, Pounds, McManus, Hause, Freeman and Shelley were charged with grand theft from 11 different victims. In Count III, defendant Ross alone was charged with the crime of receiving stolen property. After a trial commencing September 10, 1958, and lasting until November 22, 1958, the jury found all de-

fendants guilty as charged. The court, on judgment, granted conditional probation to Freeman, Ross, Hause and Shelley, fined the corporate defendant $5,000, sentenced Pounds and McManus to state prison, and imposed fines of $5,000 and $8,500, respectively, on Pounds and McManus. Each defendant appeals.

The huge mass of details produced in more than two months of the trial, recorded in more than five thousand pages of transcript, is such that it is not feasible to recount it except in general effect. In general essence, it is as follows:

In October, 1956, defendants Hause, Freeman and Pounds organized the defendant corporation, Scottie Mortgage and Loan Company, whose principal purpose was to act for investors as a so-called "builder's control" company. Said defendants caused written information to be disseminated among prospective investors that the investor would receive for his money a note secured by a first trust deed and that his invested money would be kept in a special trust account to be paid out solely for the construction of designated buildings on the particular lot described in the trust deed security. The Company also guaranteed that if the builder failed to complete the particular building involved, Company would do so. Builders were informed that if they would execute notes and deeds of trust on properties where construction was planned, Company would sell such securities, withhold from the sale money a 10 per cent commission and place the balance in a trust account for use solely on construction expenses. Material and service suppliers were informed that their compensation for services and materials was to be paid from the money held in trust.

Substantial amounts were withdrawn from said trust funds by all with the connivance of various defendants at different times, for uses other than those designated in the information thus disseminated to the public. Trust funds were often withdrawn and commingled with the Company funds. Both trust funds and Company funds were on many occasions diverted to the private purposes of some of the defendants. Despite the fact that some funds withdrawn were from time to time replaced, the net and final result of these improper withdrawals was complete exhaustion of both the trust funds and the Company funds, thus many of the buildings were not completed, with corresponding loss of security to investors, builders and materialmen.

Testimony regarding purchases by investors under these general representations, where the building was either never started at all or remained uncompleted, appears to cover about 18 buildings, although the improper shuffling of trust funds with the Company funds numbered many more. Involved in some of these transactions were many checks issued without sufficient funds in an apparent attempt to temporarily placate some investors, materialmen or builders.

Testimony was received regarding 10 different building materials and services suppliers whose deliveries of building supplies had apparently been made on the representation regarding money held in trust and had received bad checks that were never made good or no move at all was made for payment of balances due.

Testimony was adduced regarding several builders who started construction in reliance on the information that the monies received from the trust deed notes on the lots on which such builders were to construct buildings, would be placed in the trust fund to insure availability of funds to do the construction. In many cases these builders ultimately found that such money had disappeared from the trust fund and that no money was available for construction.

Testimony was received regarding the withdrawal or participation in the proceeds of withdrawal from the trust fund for purposes contrary to the trust promises in various sums. These involved withdrawals of $3,500, $5,000, $5,000 and $1,500 to the Company general account by McManus between February and May of 1957, and a final large sum to Hause when Hause sold out in May. Freeman participated in this transaction, instructing the withdrawal from the trust fund. The Company funds were often overdrawn and trust funds transferred to meet these overdrafts. While some of these transfers were replaced, there was testimony that the trust funds were still short a net of $6,500 at the time Hause left in May of 1957. After Hause left, McManus assumed the presidency and continued the practice to the extent of the withdrawal of 14 trust fund transfers to the Company funds, totaling $46,800 from May, 1957, to January, 1958. January 27, 1958, Pounds caused $600 to be drawn from the trust fund to make a payment on his private airplane. Some of the money transferred during this last eight-month period from May, 1957, to January, 1958, was returned, but testimony was given to the effect that a net deficit of $22,300 remained in trust fund accounts at the time McManus left the presidency in January, 1958. At

that time Pounds took over the presidency of the Company and $8,000 was received into the trust fund account from sales of securities and was all used contrary to the trust purpose, going either into Pounds' personal use or to general Company expenses.

Testimony was further received that during 1957 McManus used one H. E. Heineke as a front to buy at tax sale certain lots of questionable value at Elsinore. McManus caused Heineke to deed seven of these lots to the Company; had Heineke endorse a $28,000 Company check (payment for the lots) back to McManus as an individual. McManus then deposited the check to his own personal account and drew a check to the Company in like amount, depositing it in the Company account and retrieving from the Company his $28,000 note originally given in part payment in buying out Freeman's stock. Neither the Company account nor McManus' personal account had in it sufficient funds to pay this check during any of the time these $28,000 checks were moving around. Several witnesses valued the lots at some $50 each up to possible maximum amounts of $700. However, it appears that McManus bought all nine lots for $815 as against the $28,000 he took from the Company for them.

In August, 1957, Freeman persuaded W. L. Prunty to take title to a lot, signing a first trust deed and mortgage for $7,500 and a second for $4,500 thereon. Prunty was paid $25 for acting as dummy in this transaction. During the same month, Freeman engineered a similar transaction with N. B. Martin. Other similar dummy transactions appear in the testimony in connection with Freeman, McManus or Pounds. Some were sold at a discount and some traded for other property.

Testimony, apparently to show a previous pattern of conduct by McManus and Ross, was received that in 1954 McManus acquired 6 acres in Riverside County at a tax sale, for the sum of $60. Less than three months later, defendant Ross took title for a purported price of $3,000, giving McManus a deed of trust and note for $2,500 for purported unpaid purchase price. This was traded to a Mrs. Macknicki as a down payment on the purchase of her home by McManus. Ross never made any payments on the deed of trust nor in any way contacted Mrs. Macknicki, nor do the records show that he ever again evidenced any interest in the property. After Mrs. Macknicki foreclosed, she found the property to have little or no saleable value.

In 1954 McManus bought for $25 a sliver of land about 190 feet long, 20 to 26 feet wide at one end and tapering to a point at the other end, at Stockton, California. The previous owner had purchased it for $1.00. In purchasing from W. V. McStay a house and lot in La Mesa, McManus used Heineke as a dummy buyer, told McStay the lot in Stockton had been sold for $2,500 to an Opal Davidson with a trust deed back for $1,600 as balance of the purchase price, on which $17 had been paid by her. He traded this trust deed to McStay receiving a credit on the purchase price of McStay's home in the amount of $1,583. Opal Davidson was never again heard from nor found. Her purported San Francisco address was fictitious. In his cross-examination regarding this transaction, McManus was vague and uncertain and could remember little.

In July, 1957, Freeman received from McManus a Company check for $10,000, which he deposited to his own account and gave back a check in the amount of $10,000, which was deposited to the Company account. McManus' testimony regarding this is somewhat confusing as he gave as his reason for the two checks, ''the bills were staggering and it was on Friday and I didn't have enough money to meet all the payroll and everything and he lent me $10,000.'' Later he admitted the two checks would cancel each other and were dated on the same date but indicated that Freeman's check was not supposed to be cashed immediately.

In July, 1957, Donald C. Wallace, Leroy Anderson and defendant Abe Shelley entered into a building supply partnership. They eventually bought for a small down payment eight lots that are called in evidence the ''Grace Manor Project.'' Shelley contacted McManus to sell construction loan deeds of trust and notes on said lots through Company. Anderson dropped out of the partnership, and further lots were obtained by small down payments for the same purpose from the Arnold Estate. To get money from the Company for this purchase, Shelley presented to the Company an invoice signed by Wallace which merely directed that the sum be charged to ''personal expense account.'' Thus, $5,000 was secured from the Company trust fund, and later additional sums were secured by Shelley from the trust fund on other projects in a similar manner. Of the $80,000 secured from the sale of trust deeds in the Grace Manor tract, a large sum apparently found its way into the pockets of Shelley, McManus, Pounds or others. Wallace estimated that $35,862.11 was missing from the trust fund on the Grace Manor accounts. The Company books indicate a shortage of $57,017.32.

In January, 1958, various items of personal property were purchased from Sears Roebuck and Company, were delivered to McManus' personal residence, and the charge of $453.72 was paid directly from Company funds.

In July, 1957, Pounds purchased an airplane. Pounds paid $3,765.85 of the purchase price from Company funds, of which $600 was transferred from the trust account the same day. McManus signed the check.

During the period from September 3, 1957 (when the trust account was established with the bank) and November 21, 1957, McManus caused such a flood of bad checks to come into the account (114 checks) that the bank refused to further carry the account. In August, 1957, McManus bought in his own name four lots in Marilou Park and drew $2,010 from the trust account to pay therefor.

Lots in Skinner's Addition were purchased by Freeman. He transferred three of them to Heineke without money payment and Heineke built houses thereon with Company funds. In January, 1958, Heineke signed blank grant deeds thereon at the direction of McManus, understanding that title would go to Company, but the deeds were later filled in and recorded in the names of McManus and wife.

In December, 1957, McManus and Shelley purchased lots from Arnold, using Company checks totaling $2,000 as down payment. March 28, 1958, deeds were recorded by which McManus and his wife, Muriel, conveyed to Ross several properties in the acquisition of which McManus had used funds out of the Company or trust fund bank accounts. These consisted of the four lots in Marilou Park, two lots in Skinner's Addition, and one of the lots (Lot 90) purchased from Arnold. Said Lot 90 was deeded the following day by Ross to one Muriel Langford. This is McManus' wife's maiden name. May 1, 1958, Ross and McManus appeared in the building department at National City applying for a building permit for said Lot 90 in the name of Muriel Langford, listing her address as 737 East Second Street, which was, in truth, the residence of Ross and not the residence of Muriel Langford (Mrs. McManus). Ross signed the application for the permit, although he was not the builder. Under date of June 26, 1958, a deed appeared in the recorder's office purporting to deed said Lot 90 from Muriel Langford to a Paul Williams. At the purported request of the grantor, this deed was mailed to the purported grantee in Phoenix, Arizona, General De-

livery. The deed was returned by the United States Post Office, unclaimed.

■ Defendants assign the dismissal from the jury of a juror named Fredericks, as prejudicial error. It appears from the record that the district attorney, during the examination of a witness, was accused by juror Fredericks of having winked at alternate juror Hall. This action the judge had not seen. The judge tentatively attempted to calm the parties, stated the district attorney should not have winked, and apparently considered the matter closed at the moment. However, on further consideration, the matter was taken up in chambers. The judge there expressed the opinion that juror Fredericks had appeared exceedingly angry and had exhibited hostility toward both the prosecutor and alternate juror Hall. After extended discussion of the matter in chambers, out of the presence of the jurors, the judge finally decided to excuse both Fredericks and Hall to reduce friction among the jurors. In the course of a long trial such as the one here at bar, nerves and tempers are not uncommonly on edge and the judge must exercise the utmost patience and forbearance in controlling situations of this kind. That the judge in charge of this trial might well have felt justified in terminating this incident with the admonition given before he retired to chambers is clear. However, he had the duty of controlling such matters as in his judgment would be most conducive to the expeditious and harmonious conduct of the trial to the end that both the defendants and the people would have the matters at issue fairly determined on the merits. Penal Code, section 1089, provides as follows with respect to the matter here under discussion:

"If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his duty, or if a juror requests a discharge and good cause appears therefor, the court may order him to be discharged and draw the name of an alternate, who shall then take his place in the jury box, and be subject to the same rules and regulations as though he had been selected as one of the original jurors."

No authority covering the exact circumstances here shown has been cited. ■ However, as basic principles govern the matter, it is well to have in mind that nothing in our Constitution or laws guarantees to an accused the right to trial by a jury composed of any particular individuals. (*People* v. *Ab-*

*bott,* 47 Cal.2d 362, 372 [303 P.2d 730].) ■■■ As was said in that case, the alternate jurors had all been examined and passed by the defendants. They had heard all of the evidence. They were competent in every respect to decide the issues fairly and without prejudice to either side. There is no claim to the contrary by any defendant. It is necessary for defendants to show prejudice before a cause will be reversed. The mere claim of prejudice does not make it so, and we are unable to find any in the record before us. Many cases have upheld the substitution of an alternate juror and the constitutionality thereof under varying circumstances. (*People* v. *Lanigan,* 22 Cal.2d 569, 578 ■ [140 P.2d 24, 148 A.L.R. 176]; *People* v. *Von Badenthal,* 8 Cal.App.2d 404, 412 [7-8] [48 P.2d 82]; *People* v. *Tinnin,* 136 Cal.App. 301, 318 [7] [28 P.2d 951]; *People* v. *Hess,* 104 Cal.App.2d 642, 680 [29] [234 P.2d 65] (hearing denied by U. S. Supreme Court, 342 U.S. 880 [72 S.Ct. 177, 96 L.Ed. 661]); *People* v. *Burns,* 84 Cal.App.2d 18, 32 [4] [189 P.2d 868] (hearing likewise denied by U. S. Supreme Court, 335 U.S. 844 [69 S.Ct. 66, 93 L.Ed. 394]); *People* v. *Love,* 21 Cal.App.2d 623, 628 [4] [70 P.2d 202]; *People* v. *Peete,* 54 Cal.App. 333, 362 [24] [202 P. 51].) Discretion in a matter of this kind must necessarily be vested in the trial judge. The appellate court cannot hear the tones of voice, see the facial expressions, nor observe the demeanor generally of the persons involved. In the absence of abuse of discretion shown by the record and of prejudice to the defendants, we cannot set aside or annul the order of the trial judge. Neither abuse of discretion nor prejudice is shown by this record.

■■■ The next contention made by defendant McManus is that the court erred in refusing to give certain instructions proposed by him to the general effect that before a verdict of guilt may be returned by the jury, there must be unanimity by all members of the jury that the theft proven was either by embezzlement, by larceny, or by obtaining money by false pretenses, i.e., that if part of the jury thought it was embezzlement and part of the jury thought it was larceny or obtaining property by false pretenses, no verdict could be returned. In support of this contention counsel cites *People* v. *Massey,* 151 Cal.App.2d 623, 658 [312 P.2d 365], and *People* v. *Ashley,* 42 Cal.2d 246, 258 [267 P.2d 271]. The Massey case does not help us as the subject of jury consideration or instruction is in reality not discussed. Fairly read, we think the Ashley case is directly contrary to defendant's contention. ■■■ For

more than a century prior to the change in Penal Code, section 484, defendants had been wiggling out of convictions because of the fine distinctions necessarily drawn between embezzlement, larceny by trick and device and obtaining property by false pretenses, and due to the difficulty in explaining these distinctions to a lay jury, the Legislature took cognizance of this problem by changing section 484 so that as was said in the Ashley case at page 258 [3], ''Jurors need no longer be concerned with the technical differences between the several types of theft, and can return a general verdict of guilty if they find that an 'unlawful taking' has been proved.''

 The defendant's contention is without merit. (*People* v. *Hodges,* 153 Cal.App.2d 788, 794 [9] [315 P.2d 38].) The trial court clearly defined the various methods possibly included and repetition was not required. Defendant's arguments respecting ''quantum'' of proof are in the same category. (*People* v. *Becker,* 94 Cal.App.2d 434, 443 [4] [210 P.2d 871]; *People* v. *Hawker,* 80 Cal.App.2d 945, 953 [6] [183 P.2d 354].) We find in *People* v. *Gould,* 125 Cal.App.2d 447 [270 P.2d 551], and *People* v. *Petrin,* 122 Cal.App.2d 578 [265 P.2d 149] (cited by defendant), nothing to change our views in this regard.

 Next, defendants complain of misconduct by the prosecuting attorney in the manner of asking certain questions and in remarks to the jury. Some of the instances referred to were stopped by the court without objection. Some were instances in which counsel engaged in improper repartee, and in some instances the district attorney's position does not appear to be improper. By way of examples of improprieties, the district attorney's opening statement contained a partial sentence in which he said ''Like Dr. Frankenstein, Mr. Hause. . . .'' Here he was interrupted by both defense counsel and the court and instructed by the court to confine himself to statements of what he intended to prove. Just what the district attorney had intended to say does not appear. Argumentative material, of course, has no place in an opening statement. Apparently some was intended but opposing counsel and the court promptly stopped it before it started. No harm was done. Some matters referred to by defense counsel are either incorrectly quoted or transcript pages are· incorrectly given so that we cannot identify them. Some remarks were promptly stricken on objection of counsel or on the court's own motion. Upon occasion the court severely reprimanded the district attorney. Some remarks and questions

here referred to this court's attention were not objected to in the trial court. Questions to Hause referring to purchasing an airplane as a "getaway" conveyance were either not objected to or defense counsel addressed his objections to the district attorney and not to the court. The witness' answers cleared the matter up promptly and no harm appears. At one time defense counsel and the district attorney argued about whether or not certain books had or had not been produced under subpoena. At another time a brief remark was made by the district attorney relating to a statement of defense counsel that it would save time to obtain certain accounting information from the auditor. The district attorney said, "especially the one your client hired." The remark was stricken and the jury instructed to disregard it. In any event the remark, while wrong, was nevertheless extremely innocuous in the light of the whole testimony. A reference at one point to "get away" money was stricken even before defense counsel made a completed objection. Several exchanges occurred in which aspersions of a mild character were traded between the district attorney and defense counsel. On the whole, the record will not support a conclusion that the district attorney was guilty of a studied or intentional course of unfair tactics. For a trial of this magnitude the record shows remarkably few instances in which either the district attorney or defense counsel overstepped the bounds of propriety, although due to the extended character of the trial the accumulation of all these instances at one place might make them appear of greater importance than they in reality were. Most of them were promptly corrected by the court, and very few can be classified under any other term than innocuous. As to those instances where no objection was made to the trial court, defendants cannot now complain. (*People* v. *Steelik*, 187 Cal. 361, 377 [203 P. 78] ; *People* v. *Scaggs*, 153 Cal.App. 2d 339, 359 [14] [314 P.2d 793].) As to those instances in which the court promptly sustained objections and admonished the jury to disregard same, it must be presumed that such admonition was heeded. (*People* v. *Black*, 45 Cal.App.2d 87, 98 [8a] [113 P.2d 746].) It must be kept in mind that we are here dealing with human beings, not automatons, and minor errors invariably are to be found in every record of a lengthy trial. On the whole record, we cannot find prejudicial error by the district attorney worthy of serious note.

■ Defendants also claim misconduct by the trial judge

in the making of remarks and the asking of questions. Defendant McManus at one point was asked by the court if he intended calling his wife as a witness and whether or not he was aware that the prosecution could not do so. There was no statement nor any fair inference from the court's question that the court was demanding of McManus that she be, in fact, called as a witness, nor did the court comment thereon. That the court was treading on dangerous ground that might have developed into reversible error had it gone further, or made comments on her absence, is true and we think extreme caution should be exercised by judges in asking questions of this kind. However, neither *People* v. *Wilkes,* 44 Cal.2d 679 [284 P.2d 481], nor *People* v. *Ward,* 50 Cal.2d 702 [328 P.2d 777], hold that the mere asking of a question of this kind without comment would of itself be error. In the record as it stands, we see no prejudicial error.

▆▆ Counsel complains of what is termed a "peremptory" ruling of the court placing defendant Ross as next in line of the various defendants to proceed with his defense. Apparently this was related in some way to positions of counsel at the counsel table or in the order in which they had been questioning witnesses. Whatever the reason, it was time for some defendant to proceed. The decision in that respect was on the shoulders of the trial court. Some weeks of trial had already gone by and Ross and his counsel had had plenty of time to decide whether or not Ross would take the witness stand. At no later time did Ross offer to nor make application for permission to take the witness stand in his own defense. We have no doubt the trial court would have granted the request had it been made.

▆▆ On a few occasions the court indulged in some questions in order to clarify a particular matter then before the court, which was apparently not clear in the court's mind. It was not only the right but the duty of the court to do so if it appeared necessary. A few of the incidental comments of the court might well have been dispensed with, but we do not find them seriously harmful to defendants except insofar as the questions might have legitimately elicited some additional information. By far the most critical comments were directed toward the district attorney. Even those were mild. Some objections were sustained that might have been overruled, but any such rulings were rendered harmless by reason of the fact that the evidence involved eventually was fully testified to.

█ Objection is made that at times the court did not wait for an objection before ruling a question or comment to be improper. An examination of the record will not reasonably sustain a conclusion that the court played any favorites between prosecution and defense. When a question is improper or calls for improper evidence, an alert judge may often feel called upon to intervene without an objection. To do so is not error. While it might have seemed to defense counsel in their anxiety for their clients, that the court was at times abrupt or lacking in suavity, we think an impartial reading of the whole record does not support that position. We are unable to see in the record any pattern of judicial behavior amounting to advocacy.

█ Defendants complain of an occasion in which the court, in an instruction, erroneously used the terminology, other "crimes," when it should have used the words, other "transactions." Shortly thereafter, at a recess, this error was called to the court's attention and immediately after the recess, the court went back over the whole instruction, explained the error to the jury and corrected the terminology. From the record we are unable to see how the jury could have misunderstood the correction. Defendants assert prejudice and contend that the change of the instruction amounted to a plain direction of a verdict of guilty. They cite neither authority nor reasons therefor. No suggestion was ever made that other transactions besides those charged did not, in fact, take place. It was only as to some of the minor details of such transactions and as to the proper interpretation respecting these that there was any dispute. The court did not attempt to interpret them nor to take away from the jury, by inference or otherwise, the jury's prerogative of weighing and applying such evidence as it thought the facts warranted. It must be presumed, in the absence of a showing to the contrary, that the jury heeded the corrective instruction. (*People* v. *Pearson,* 111 Cal.App.2d 9, 20 [11] [244 P.2d 35] ; *People* v. *Ferlin,* 203 Cal. 587, 600 [265 P. 230].)

█ Freeman contends that the evidence is insufficient to sustain the verdict of guilty against him as to Count I (conspiracy). Penal Code, section 182, makes an agreement between two or more persons "to cheat and defraud any person of any property, by means which are in themselves criminal, or to obtain money or property by false pretenses or by false promises with fraudulent intent not to perform such promises" criminal conspiracy. Section 184 requires as a pre-

requisite to conspiracy becoming a punishable crime that one or more of the parties thereto must do some overt act within this state to affect the object of the conspiracy. As was said in *People* v. *Moran,* 166 Cal.App.2d 410, 414-415 [333 P.2d 243] :

"It is not necessary to prove that the parties entered into a concrete written agreement or even that all the parties gathered together at one time for a mutual and immediate discussion and agreement. It can happen that the agreement be arrived at in piecemeal fashion. It is sufficient if by either direct or circumstantial evidence, or both, the trier of fact is convinced beyond a reasonable doubt that the unlawful agreement did, in fact, come into existence and that while it was still in existence an overt act pursuant to the unlawful conspiracy purpose was committed. (Citations.)

 " 'As a general rule, a conspiracy can only be established by circumstantial evidence "for, as the courts have said, it is not often that the direct fact of an unlawful design which is the essence of a conspiracy can be proved otherwise than by the establishment of independent facts, bearing more or less closely or remotely upon the common design (citation) ; and it is not. necessary to show that the parties met and actually agreed to undertake the performance of the unlawful acts (citing authority), nor that they had previously arranged a detailed plan . . . for the execution of the conspiracy".' (Citation.)

 ". . . Where a conspiracy has already been formed and at a later date a stranger to the original conspiracy associates himself with the conspirators, and with knowledge of the conspiracy joins with the others in committing overt acts in furtherance of the unlawful purpose, he is guilty as a member of the conspiracy.

 ". . . '. . . [O]ne who has joined a criminal conspiracy can only effectively withdraw therefrom by some affirmative act bringing home the fact of his withdrawal to his confederates. "Some affirmative act bringing home the withdrawal to the knowledge of his confederates is necessary, otherwise the conspiracy once established will be presumed to continue until the ends are accomplished or its abandonment established." . . .' "

 The evidence is amply sufficient to justify the jury in believing that Freeman knowingly participated in causing the investing public, building materialmen, and builders, to be informed that the funds from securities would be kept in a

trust account to be paid out only on construction expenses on the particular lot covered by the security; that Freeman took an active part in unlawfully diverting trust money to purposes outside the trust restrictions; that he participated in the transaction by which he secured for the sale of his Company stock to McManus some $38,000 in Company securities and McManus placed only $10,000 and his unsecured note in the amount of $28,000 as a purported asset of the Company. This is the same note that McManus later abstracted from the Company in the exchange of checks with Heineke in connection with the spurious Elsinore lot transaction. The statement that ''One's actions speak louder than words'' is peculiarly applicable to proof in conspiracy cases. Even if one should take the view that Freeman returned part or all of the money unlawfully diverted from the trust, this would not affect his guilt. It would only be a circumstance to be weighed by the court in determining proper judgment. (*People* v. *Colton,* 92 Cal.App.2d 704, 710 [4] [207 P.2d 890]; *People* v. *Baker,* 64 Cal.App. 336, 342 [5] [221 P. 654]; *People* v. *Talbot,* 220 Cal. 3, 14 [5] [28 P.2d 1057]; *People* v. *Cheeley,* 106 Cal.App. 2d 748, 754 [7] [236 P.2d 22].)

Freeman and McManus next contend that the evidence was insufficient to sustain the verdict of guilty as to them on Count II. The authorities are clear that conviction of grand theft may be had upon proof of either larceny, embezzlement or obtaining money by false pretenses. (*People* v. *Cannon,* 77 Cal.App.2d 678, 688 [176 P.2d 409]; *People* v. *Cook,* 10 Cal.App.2d 54, 57 [1] [51 P.2d 169]; *People* v. *Jones,* 61 Cal.App.2d 608, 622 [12] [143 P.2d 726].)

In theft by trick or device the property involved must be (1) taken; (2) asported; (3) belong to another; and (4) the taking and asportation must be with the intent (without claim of right) to permanently deprive the owner thereof.

This is well illustrated by the opinion in the case of *People* v. *Edwards,* 72 Cal.App. 102, 112, 113, 115, 116 [236 P. 944], where the court said:

''To constitute larceny the first essential is that there be a 'taking.' (Citation) That is, the thing which is the subject of the crime must be taken from the possession of the owner into the possession of the thief. The taking, in order to support a charge of larceny, must be against the will of the owner or at least without his consent. In other words, the act of taking must be a trespass against the owner's possession. (Citation.) Though the taking must be against the will of the

owner or a trespass to his possession, still an actual trespass or actual violence is not necessary. Fraud may take the place of force. It is well settled that a taking, within the definition of larceny, occurs when a person, with a preconceived design to appropriate the property to his own use, obtains possession of it by means of fraud or trickery. In such case the fraud vitiates the transaction, and the owner is deemed still to retain a constructive possession of the property. (Citation.) Or, as has been said, 'the fraud will supply the place of trespass in the taking, and so make the conversion felonious.' (Citation.) It is essential in such cases that the owner shall intend to part with the possession only, and not to pass the title as well. If he intends to pass both the possession and the title, the transaction, though it may amount to the crime of obtaining property by false pretenses, will not constitute larceny. But the owner does not part with the title to the alleged thief where the thing which is the subject of the theft is delivered by the owner to the accused to be applied by the latter to a particular purpose, and the recipient of the property, having obtained the possession fraudulently with the preconceived intention to appropriate the property to his own use, does subsequently convert it to his own use instead of applying it to the purpose contemplated by the owner. . . .

". . . Where, as in the instant case, the accused acquires possession by fraud or trickery, intending when he acquired the possession not to devote the thing to the purpose for which it was delivered to him but to convert it to his own use, his subsequent conversion of it to his own use, though it be but for the smallest appreciable length of time, is such a complete, independent and absolute possession and control of the thing, adverse to the rights of the owner, as to be tantamount to that asportation which occurs in those cases where the original taking and carrying away involved an act of trespass by actual violence. . . .

". . . In cases such as this, where the possession was originally obtained by fraud or trickery, the wrongdoer holds the property all the while without right, and against the right and without the consent of the owner. . . .

"The third essential element in the crime of larceny is that the thing taken and carried away should be the property of another. (Citation.) That is, someone other than the taker must have in the thing taken a general or special property right which is invaded by the trespass committed in the taking. Considered as an element of larceny, 'ownership' and 'possession' may be regarded as synonymous terms; for

one who has the right of possession as against the thief is, so far as the latter is concerned, the owner. (Citation.) Since appellant acquired possession of the money by fraud and chicanery, he held it all the while without right, and as against him Mrs. Benoit (the owner) had the right of possession. . . ."

To the same general effect see *People* v. *Beilfuss*, 59 Cal. App.2d 83, 89 [138 P.2d 332]; *People* v. *Barnett*, 31 Cal.App. 2d 173, 175 [88 P.2d 172].

 In the case at bar, the evidence was amply sufficient for the jury to conclude that prospective purchasers of deeds of trust, building materialmen, and builders, were informed that the money obtained from sale of deeds of trust would be kept in trust for payment of the construction costs on buildings on the land covered by the deeds of trust; that such purchasers of said deeds of trust intended that the money paid should be kept in the trust account until paid out directly for construction costs; that the money was used by these alleged conspirators knowingly and intentionally, for purposes other than the construction of buildings on the real property covered by the respective purchased securities; that the whole course of action indulged in by said alleged conspirators showed that a general agreed plan was followed from the start and that they did not at any time ever intend to confine the trust monies to payment of construction costs on the respective parcels of real property, but did intend to from time to time devote it to their own use as their various desires dictated; that the representations so made to the investors were made for the purpose of securing possession of the money; that such money was used in large part for purposes contrary to and in violation of the trust intent of the investors; that the alleged conspirators did intend to permanently deprive the owners of their property without any claim or pretense of right or justification therefor. This fulfills the felonious intent required by law and is sufficient to support the verdict of guilt of theft, of larceny by trick or device.

If the jury believed that the money was originally obtained in good faith and that the design to appropriate it was formed later, it would, of course, have been justified in finding theft by embezzlement. (*People* v. *Knox*, 32 Cal.App. 158, 163 [162 P. 407].)

 Freeman next contends that the court's refusal to admit evidence of the water service contract with the city of San Diego was prejudicial error. This evidence showed an

agreement by the city to give temporary water service during construction on the lots in the Marilou tract, and further related to alleged promises by the city to put in permanent water pipes, and that the city later declined to make such installation, thus placing the onus therefor on Freeman. Just how this could have affected Freeman's intent in misusing trust funds taken directly from the trust account or improperly transferred to the Company account therefrom, we are unable to understand. In addition, it appears from the record that the general substance of the whole situation respecting this particular water problem went into evidence by Freeman's own testimony and was not contradicted. Thus no prejudice occurred in any event. (*Frazier* v. *David,* 187 Cal. 724, 726 [204 P. 17].)

Freeman next complains of lack of instructions embodying the principles of Penal Code, section 511; that is, that any appropriation of property made openly and avowedly under claim of title preferred in good faith, even though such claim were, in truth, untenable, is a defense to embezzlement. (*People* v. *Crane,* 34 Cal.App. 760, 767 [168 P. 1055]; *People* v. *Photo,* 45 Cal.App.2d 345, 353 [2] [114 P.2d 71]; *Singleton* v. *Singleton,* 68 Cal.App.2d 681, 693 [8] [157 P.2d 886].) However, it must be remembered that the persons here involved were the investors. They were informed, and the evidence shows without contradiction that Freeman knew they were informed, in writing, that their money would be kept in a trust account to be paid out only on the construction costs on the individual parcel described in the trust deed. This was clear and unequivocal and there was no contrary evidence. This makes Freeman's position untenable at the outset. (*People* v. *Brock,* 21 Cal.App.2d 601, 611 [10] [70 P.2d 210].) The court adequately instructed on the necessity of proof of felonious intent as a part of the People's case but the defense of an open and notorious taking under claim of right is an affirmative defense. There was no evidence whatever, and no attempt to produce any, that Freeman ever informed the investors who bought deeds of trust or any of them, or caused or attempted to cause any of them to be informed, that their money would be transferred from the special trust account into the general Company account to be paid out willy-nilly for purchase by the Company of other properties, or loans to favored builders, or personal expenses, or for airplanes, or in any other direction the Company officers saw fit. The mere fact that Freeman, on one occasion, conferred with the Company directors (who were his alleged fellow conspirators),

regarding sales of Freeman's stock, would not be evidence supporting openness nor good faith insofar as the investors, who were the real parties in interest here, were concerned.

It is perfectly true that instructions should be given on every theory of the case if such theory is reasonable and if it is supported by evidence. (*People* v. *McAuliffe,* 154 Cal.App.2d 332, 344 [10] [316 P.2d 381]; *Daniels* v. *City & County of San Francisco,* 40 Cal.2d 614, 623 [10] [255 P.2d 785]; *People* v. *Carnine,* 41 Cal.2d 384, 390 [5] [260 P.2d 16].) However, the mere fact that he made a self-serving claim of "title in good faith" at the trial cannot be treated as evidence when the other uncontradicted testimony, much of which he himself gave, and the written exhibits, leave no possible basis for such a claim. Instructions must be based on evidence, and no instruction should be given merely to support a claimed defense that finds no support in the evidence. (*People* v. *Sutic,* 41 Cal.2d 483, 493 [7] [261 P.2d 241]; *People* v. *Carmen,* 36 Cal.2d 768, 772 [1] [228 P.2d 281].)

Complaint is made by Pounds that the court erroneously admitted evidence that Pounds had previously committed the crime of issuing checks without sufficient funds with intent to defraud. Pounds was charged here along with the other alleged conspirators, with the crime of conspiracy to defraud by certain criminal means, and one of those means which was charged was issuance of checks without sufficient funds with intent to defraud. In the case of one bank account alone 114 such checks were issued. Where an accused's wrongful intent is in issue, proof of other similar acts are admissible to show intent. We find no error. (*People* v. *Kinder,* 122 Cal.App.2d 457, 464 [6] [265 P.2d 24]; *People* v. *Castellanos,* 157 Cal.App.2d 36, 39 [320 P.2d 152].)

Defendant McManus argues that the refusal to admit in evidence certain escrow instructions from the seller of the lots in the Grace Manor project was error. He contends that these instructions would have shown that the seller required faithful performance bonds for any construction and that McManus thought such bonds would protect the investors. Although none of the exhibits were sent to this court for perusal, it appears from the testimony, plus the discussion between court and counsel, that the so-called faithful performance bonds referred to, were entirely framed for the protection of the seller of the land and could not reasonably have been supposed to be material on the matter of the protec-

tion of the purchaser of a note and trust deed security, to which security the trust deed of the seller of the land was subordinated. Defendant McManus has suggested no proposed proof of facts that would make such escrow instructions material, nor has counsel cited any authorities to support his position. We think the court did not commit prejudicial error in this ruling.

The defendant Ross was not accused of conspiracy. He was accused solely of receiving stolen property. The references to Ross in the testimony are scattered and comparatively brief. The testimony shows that Ross had been an employee of the Solar Aircraft Company about five years previously, and that McManus had met him there; that Ross had received a deed to certain property in Riverside County in 1954 for an apparent purchase price of $3,000, giving back a trust deed and note for $2,500 to McManus; that McManus sold the note and deed of trust; that the buyer foreclosed without any payments from Ross and that the buyer, after foreclosure, was unable to sell the property and deemed it of little value; that in 1956 Ross was operating a restaurant, that McManus took over management of the restaurant when Ross left San Diego; that McManus sold the restaurant and took back the securities in his own name, collecting and keeping the $2,300 paid thereon; that Ross remained away from San Diego from 1956 to 1958; that McManus deeded his and his wife's equity in certain lots to Ross in payment of this $2,300 indebtedness and an additional $1,000 paid by Ross; that McManus recovered title to Lot 90 at the wish of his wife, and at her direction had it put in her maiden name on account of the fact that her parents had assisted the McManus' financially; that the property was later deeded to a third party whose address was in Phoenix, Arizona, General Delivery, and that the deed was never delivered by the Post Office; that Ross appeared at the building department of National City in company with McManus and there applied for a building permit for said Lot 90 in the name of Muriel Langford (McManus' wife), listing her address as 737 East Second Street, which was, in truth, the residence of Ross and not the residence of Mrs. McManus. Ross did not take the witness stand in his own defense.

While it is true that the evidence respecting Ross is by no means overwhelming, taken all together, Ross' activities in connection with the Riverside transaction, the large number of lots transferred to him without any title search, the almost

immediate redeeding of one of those lots in McManus' wife's maiden name, the appearance in the building department of National City to apply for a building permit in Muriel Langford's name, the fact that Ross knew he was not the builder, the fact that he knew Muriel Langford's true address was not his own, are sufficient to create an inference of guilty knowledge. Once this point is reached, his failure to take the witness stand and simply give an explanation of his conduct adds serious weight to these circumstances.

 Ross also complains of the refusal of the court to give certain instructions respecting the essential elements of the crime of receiving stolen property. All of the elements of that crime were included in the instructions given by the court and the general essence of everything requested by Ross was included in the instructions given. The court is under no duty to repeat in any particular language the law that has been given to the jury.

On a review of the entire record, we are unable to say that a different result would have been reached had those matters in which we found error not occurred.

The judgments and orders appealed from are affirmed.

Griffin, P. J., and Coughlin, J., concurred.

Petitions for a rehearing were denied May 17, 1960, and appellants' petitions for a hearing by the Supreme Court were denied June 8, 1960. Peters, J., was of the opinion that the petitions should be granted.